### In re James M. KOHLS and Christine K. Kohls, Debtors.

### Thomas E. BREVER, Trustee In Bankruptcy, Plaintiff,

### v.

### STATE BANK OF YOUNG AMERICA, Defendant.

Bankruptcy No. 4–86–849.
Adv. No. 4–86–303.

United States Bankruptcy Court, D. Minnesota.

June 16, 1987.

---

I.

James and Christine Kohls operated a dairy farm in Plato, Minnesota, until filing for bankruptcy on March 25, 1986. In conjunction with their farm operations, the Kohls marketed their dairy products through Bongards Creameries. This dispute concerns $14,395.31 in patronage credits being held by Bongards for dairy products the Kohls marketed from 1983 through 1985.

Bongards is a nonprofit farmers cooperative that markets agricultural products for its patrons.[1] Upon selling or delivering products to the cooperative, patrons are entitled to payment of the net margin of their product sales. The "patron's net margin" is defined in the cooperative's bylaws as gross receipts less:

(a) all necessary marketing costs and expenses; and

(b) the actual costs and expenses of supplies and equipment procured for the patrons; and

(c) the actual cost of services performed for patrons; and

(d) reasonable amounts for expense and valuation reserves for any necessary operating purposes, including without limitation, reserves for depreciation of physical properties and other assets, for doubtful accounts, or for other possible losses; and

(e) all other necessary expenses. The balance of said gross receipts remaining after said deductions, calculated upon an annual fiscal year basis, shall be deemed to be the "patrons' net margins" which, as received by this association, shall belong to and be held for its respective patrons, and shall be distributed to them at the close of each fiscal year on a patronage basis as hereinafter provided.

Although the patron's net margin is payable at the close of each fiscal year, the cooperative is authorized under the bylaws to withhold specified amounts of the net

Arthur C. Benson, Harvey, Sheehan & Benson, Minneapolis, Minn., for plaintiff.

Robert A. Nicklaus, Nicklaus & Fahey, Chaska, Minn., for defendant.

## MEMORANDUM ORDER

ROBERT J. KRESSEL, Chief Judge.

This proceeding came on for trial on June 2, 1987, to determine the validity of the State Bank of Young America's security interest in certain patronage credits. Arthur C. Benson appeared for the trustee, and Robert A. Nicklaus appeared for the bank. This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 103(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) and (O). Based on the stipulated facts, memoranda of counsel, and the file of this proceeding, I make the following:

1. The term patron includes members, producers, and purchasers who do business with Bongards.

margin as a contribution to the patrons' revolving fund.[2]

The proceeds held in the revolving fund [3] are used to offset any loss the cooperative may incur in any particular fiscal year. Article VII, Section 3 of the bylaws provides:

> If any one or more divisions or departments shall operate at a loss in any fiscal year, or if the association shall sustain any loss which equitably should be charged to the operations of any prior fiscal year or years, and if said loss or losses exceed the reserve for permanent surplus, then such excess shall be charged against the revolving fund, and the Board of Directors shall reduce the interests of the respective patrons in said fund so as to prorate such loss among such patrons and on such basis as may be equitable in view of the purpose of this association to conduct all of its activities on a cooperative and non-profit basis.

If the balance in the revolving fund exceeds the amount of capital reasonably needed by the cooperative to conduct business, payments are required to be made to patrons on a prorata basis to the net credits [4] which represent the earliest contributions to the fund. Since 1978, the cooperative has paid 100% of the net credits withheld in each year with the exception of one year when a special tax assessment reduced the payout. Net credits have historically been held for eight years before payment is made to patrons.

From 1983 through 1985, the Kohls marketed their dairy products through Bongards Creameries. The specific transactions are summarized below:

| Year | Net Margin | Cash Payment | | Credits Withheld |
|------|-----------|--------------|---|-----------------|
| 1983 | $ 4,554.78 | $ 910.96 | (20%) | $ 3,643.82 |
| 1984 | 606.36 | 151.96 | (25%) | 454.77 |
| 1984 | 6,784.37 | 1,696.09 | (25%)[5] | 5,088.28 |
| 1985 | 6,944.59 | 1,736.15 | (25%) | 5,208.44 |
| | $18,890.10 | $4,494.79 | | $14,395.31 |

The Kohls currently hold $14,395.31 in patronage credits. Assuming Bongards continues its current practice, payments on the net credits will be made in 1991, 1992, and 1993.

The bank claims a right to any future payments toward the patronage credits pursuant to a security agreement executed on or about April 10, 1984. The agreement gave the bank a security interest in the Kohls' inventory, equipment, farm products, consumer goods, accounts and other rights to payment. "Farm products" is defined in the agreement to include:

> All farm products of Debtor, whether now owned or hereafter acquired, including but not limited to (i) all poultry and livestock and their young, products thereof and produce thereof, (ii) all crops, whether annual or perennial, and the products thereof, and (iii) all feed, seed, fertilizer, medicines and other supplies used or produced by Debtor in farming operations.

---

2. The bylaws also provide that by virtue of one's membership in the cooperative, patrons agree to claim the entire amount of net margin "in the taxable year in which such written notices of [patronage] allocation are received ..." even through the patron typically only receives 20–25% of the net margin in that taxable year.

3. Contributions to the revolving fund are not segregated from other assets of the cooperative. The fund is simply an accounting item to keep track of individual patron's contributions.

4. "Net credit" is the term used to designate the amount of the patron's net margin that is held in the revolving fund.

5. On October 1, 1984, James Kohls executed an "Assignment of Proceeds of Dairy Products" in favor of the bank. The assignment authorized Bongards Creameries to pay the bank $1,000.00 in milk proceeds due the Kohls for dairy products sold to Bongards. It is unclear when and if that payment was made.

"Accounts and other rights to payment" is defined in the agreement as:

> Each and every right of Debtor to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property by Debtor, out of a rendering of services by Debtor, out of a loan by Debtor, out of the over-payment of taxes or other liabilities of Debtor, or otherwise arises under any contract or agreement, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and security interests) which Debtor may at any time have by law or agreement against any account debtor or other obligor obligated to make any such payment or against any of the property of such account debtor or other obligor; all including but not limited to all present and future debt instruments, chattel papers, accounts, loans and obligations receivable and tax refunds.

A financing statement was executed along with the security agreement and filed on April 27, 1984.

On March 25, 1986, the Kohls filed a Chapter 7 bankruptcy petition. Thomas E. Brever was appointed trustee on March 27, 1986. In the appropriate bankruptcy schedule, the Kohls claimed $6,250.00 of the patronage credits as exempt under 11 U.S.C. § 522(d)(5). That exemption was allowed by my order dated August 22, 1986.[6]

## II.

The trustee brought this adversary proceeding on December 12, 1986, to determine the validity of the bank's security interest in the patronage credits. He raises several questions concerning the scope, perfection, and enforceability of the bank's rights under the April 10, 1984, agreement. I will address each issue separately.

**6.** Since filing their bankruptcy petition, the Kohls received their 25% cash payment of $1,736.50 toward their 1985 patronage. By stip-

### (A) *Scope*

■ The first issue is whether the patronage credits are within the scope of the April 10, 1984, security agreement. That agreement gave the bank a security interest in the Kohls' inventory, equipment, farm products, consumer goods, accounts and other rights to payment. "Accounts and other right to payment" is defined in the agreement to include:

> [e]ach and every right of [the Kohls] to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods ... or otherwise arises under any contract or agreement ... and howsoever such right to payment may be evidenced....

The trustee argues that the patronage credits are not "accounts or other rights to payment," but general intangibles which are not subject to the security agreement. He relies on the definitions of "account" and "general intangibles" contained in Minn.Stat. § 336.9–106 (1986). Account is defined as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper whether or not it has been earned by performance." Minn.Stat. § 336.9–106 (1986). General intangibles is defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." *Id.*

While one could argue that patronage credits may be more properly characterized as general intangibles than accounts as defined under Minn.Stat. § 336.9–106, those definitions are not controlling in this case. It is the security agreement itself, not § 336.9–106 that determines what property is subject to the bank's security interest. *See* Minn.Stat. § 336.9–201 (1986). The security agreement in this case clearly encompasses the patronage credits. There is no reason to resort to statutory definitions to resolve an ambiguity that does not exist.

ulation dated December 1986, the Kohls and the trustee agreed that the $1,736.50 payment reduces the Kohls' exemption claim to $4,513.85.

I find that the patronage credits are within the meaning of "accounts and other rights to payment" as defined in the April 10, 1984, security agreement.[7]

### (B) *Perfection*

■ The second issue raised by the trustee is whether the bank's security interest is properly perfected. Minnesota Statute § 336.9–302 requires that a financing statement be filed to properly perfect a security interest in accounts and other rights to payment. Minn.Stat. § 336.9–302 (1986). The bank filed a financing statement on April 27, 1984, which adequately describes the collateral. Therefore, the bank's security interest is properly perfected. *See* Minn.Stat. § 336.9–303 (1986).

### (C) *Enforceability*

■ The third issue raised by the trustee concerns the enforceability of the bank's security interest. The trustee relies on 11 U.S.C. § 552(a). That section provides:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

However, § 552(b) excepts certain property from the trustee's avoidance power:

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, off-

spring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b). Thus, if the creditor had a security interest in property acquired by the debtor before commencement of the case and the security interest extends to proceeds, products, offspring, rents, or profits of that property, then § 552(b) protects the security interest.

In this case, the bank had a perfected security interest before the commencement of the case in the debtors' right to payment of their patronage credits. Any future payments would constitute proceeds[8] of the bank's security interest within the meaning of § 552(b). *See In re Sunberg,* 729 F.2d 561 (8th Cir.1984); *United Virginia Bank v. Slab Fork Coal Co.,* 784 F.2d 1188 (4th Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). Therefore, the bank's security interest is protected under 11 U.S.C. § 552(b).

■ The trustee's second claim with respect to enforceability is that the bank waived its security interest in the patronage credits by executing the "Assignment of Proceeds of Dairy Products" on October 1, 1984. To establish a waiver, the trustee must show a voluntary and intentional relinquishment of a known right. *Engstrom v. Farmers & Bankers Life Insurance Co.,* 230 Minn. 308, 311, 41 N.W.2d 422, 424 (1950); *Anda Construction Co. v. First Federal Savings and Loan Association,* 349 N.W.2d 275, 278 (Minn.Ct.App.1984), *review denied,* Sept. 5, 1984. Although this finding may be inferred from the party's acts and conduct, *First National*

---

**7.** Because I find that the patronage credits fall within the category of "accounts and other rights to payment," it is unnecessary to decide whether the credits also could be subject to the bank's security interest as proceeds of "farm products."

**8.** It is important to note that "proceeds" within the meaning of 11 U.S.C. § 552(b) does not equate with "proceeds" as defined in Minn.Stat.

§ 336.9–306 (1986) for purposes of perfecting a security interest. *See In re Sunberg,* 35 B.R. 777, 783–84 (Bktcy.S.D.1983), *aff'd,* 729 F.2d 561 (8th Cir.1984) (The use of the term "proceeds" in Section 552 is not limited to the technical definition of that term in the UCC, but covers any property under which property subject to a security interest is converted.).

*Bank v. Strimling,* 308 Minn. 207, 241 N.W.2d 478, 480 (1976), intent and knowledge are essential elements. *Engstrom,* 230 Minn. at 311–12, 41 N.W.2d at 424; *Anda Construction Co.,* 349 N.W.2d at 278, *review denied,* Sept. 5, 1984.

In this case, the trustee has not met his burden of proof. There is no evidence to show that the bank waived its security interest. No language in the October 1st, dairy proceed assignment would lead to that conclusion, and the uncontroverted testimony of a bank officer indicates that it did not intend the October 1st assignment as a waiver of its security interest.

THEREFORE, IT IS ORDERED: The State Bank of Young America has a valid and perfected security interest in the patronage credits from Bongards Creameries.

LET JUDGMENT BE ENTERED ACCORDINGLY.