Opinion
 

 POCHÉ, J .
 

 The issue presented is whether a secured creditor who obtains a defaulted debtor’s property can be subject to restitution for the amount of the value of goods furnished the debtor by a third party. The answer is no: unless there are unusual circumstances the equitable remedy of restitution must defer to the rights given a secured creditor by the California Uniform Commercial Code.
 
 [1]
 

 Background
 

 In March of 1990 as part of a concerted effort to expand the capacity of its plant in Sonoma County, Domaine Laurier Winery (Domaine) contracted with Mel Knox to purchase 200 seasoned oak wine barrels made in France. Four months later Domaine executed an agreement with Phoenix Leasing Incorporated (Phoenix) whereby Phoenix undertook to provide financing for the expansion. Phoenix was protected by (among other things) a security agreement covering all personal property, including “all equipment . . . whether now owned or hereafter acquired” by Domaine.
 

 The wine barrels came in two shipments. Upon arrival of the first lot, Knox sent an invoice to Domaine; Domaine forwarded the invoice to Phoenix, which paid it in August of 1990. With the second lot, Knox sent the invoice for $33,011.37 directly to Phoenix. Domaine also requested Phoenix to pay Knox. Approximately two months after the second shipment was delivered, but before any payment for it, Phoenix declared Domaine in default of their agreement. The barrels were included in Phoenix’s subsequent liquidation of Domaine’s assets.
 
 [2]
 

 By the time Knox’s complaint came on for trial it had been reduced to a single cause of action for “Restitution—Unjust Enrichment” against Phoenix. The case was tried on the short cause calendar following denial of
 
 *1360
 
 Phoenix’s motion that, because it was a secured creditor while Knox was not, it was entitled to judgment on the pleadings. The trial did not produce a statement of decision, simply the court’s announcement that Knox was entitled to judgment for $21,350 (70 percent of the original cost of the barrels, which was essentially their undisputed resale value).
 

 Phoenix perfected this timely appeal from the ensuing judgment.
 

 Review
 

 I
 

 According to the California Uniform Commercial Code, Domaine’s execution of a security agreement describing the property covered gave Phoenix a security interest in that collateral (§§ 9203, subd. (1), 9402, subd. (1)). Phoenix perfected that security interest when it filed a financing statement with the Secretary of State (§§ 9302, subd. (1), 9401, subd. (c)). Phoenix thus acquired priority over other Domaine creditors (§§ 9201, 9301, 9312, subds. (3)-(5)), including the right to take possession and sell the collateral if Domaine defaulted (§§ 9503, 9504, subd. (1)). It being undisputed that Phoenix complied with all of these steps, Phoenix maintains that it is immune to Knox’s restitution claim.
 
 [3]
 

 The opposing argument, which springs from the code’s general directive that its provisions are to be supplemented by “principles of law and equity” (§ 1103), has divided courts considering whether restitution can be had from a code-protected secured creditor. On the one hand, a decided majority of jurisdictions have disallowed the equitable remedy of restitution (whether
 
 *1361
 
 termed unjust enrichment, quantum meruit, contract implied in law, etc.).
 
 [4]
 
 They are willing to accept occasionally harsh results as the price to be paid for preserving the integrity of the Uniform Commercial Code’s scheme for secured transactions, encouraging compliance with the code, and thereby ensuring a predictable system of creditor priorities. (E.g.,
 
 Evans Products Company
 
 v.
 
 Jorgensen
 
 (1966) 245 Ore. 362 [421 P.2d 978, 983];
 
 Peerless Packing Co.
 
 v.
 
 Malone & Hyde
 
 (1988) 180 W.Va. 267 [376 S.E.2d 161, 164-165] [text & fn. 4];
 
 National Bank & T. Co. of So. Bend
 
 v.
 
 Moody Ford, Inc.
 
 (1971) 149 Ind.App. 479 [273 N.E.2d 757, 760];
 
 SMP Sales Management, Inc.
 
 v.
 
 Fleet Credit Corp.
 
 (5th Cir. 1992) 960 F.2d 557, 560 [applying Louisiana law].) On the other hand, California and more recently Colorado, while conceding considerable soundness to the majority position, have permitted restitution from a secured creditor.
 
 (Producers Cotton Oil Co.
 
 v.
 
 Amstar Corp.
 
 (1988) 197 Cal.App.3d 638 [242 Cal.Rptr. 914];
 
 Ninth Dist. Prod. Credit
 
 v.
 
 Ed Duggan
 
 (Colo. 1991) 821 P.2d 788 [27 A.L.R.5th 921]; see also
 
 Borg-Warner
 
 v.
 
 Valentine Associates Ltd.
 
 (1989) 192 Ga.App. 123 [384 S.E.2d 223].) An examination of these decisions demonstrates that their disagreement with the majority position is one of degree and is not nearly so profound as appears at first glance.
 
 [5]
 
 Recovery is clearly the exception, not the norm, and is subject to stem limitations.
 

 The first member of the minority camp—and the sole reported California decision in this area—is
 
 Producers Cotton Oil Co.
 
 v.
 
 Amstar Corp., supra,
 
 197 Cal.App.3d 638
 
 (Producers Cotton).
 
 The Producers Cotton firm held a security interest in the farm crops of its debtor. Amstar bought the crops and paid to have them harvested. Amstar knew of Producers’ security interest, but neglected to obtain Producers’ agreement to subordinate that interest. Amstar deducted the harvesting costs before remitting the sale proceeds of the crops to Producers. Producers sued Amstar and obtained a judgment on the theory that the deduction constituted conversion of its secured collateral.
 

 Amstar appealed, arguing that the California code’s article 9 governing secured transactions left room for the equitable principle of restitution. It relied on section 1103, which provides: “Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or
 
 *1362
 
 other validating or invalidating cause shall supplement its provisions.” Producers responded that “. . . in order to give stability and predictability to commercial transactions, the priorities dictated by article 9 must prevail over equitable principles that might otherwise apply.” Concluding that “. . . the facts present a classic case for establishing an implied in law contract, or quasi-contract,” the Court of Appeal tersely concurred with Amstar: “We agree with the position of Amstar and hold that when a party possessing a security interest in a crop and its proceeds has knowledge of and acquiesces in expenditures made which are
 
 necessary
 
 to the development of the crop, and ultimately benefits from the expenditure, a party who, through mistake, pays such costs without first obtaining subordination, is entitled to recover.”
 
 (Producers Cotton, supra,
 
 197 Cal.App.3d at pp. 658, 660, original italics.)
 

 A considerably more detailed discussion of the problem was developed in
 
 Ninth Dist. Prod. Credit
 
 v.
 
 Ed Duggan, supra,
 
 821 P.2d 788
 
 (Duggan).
 
 Like
 
 Producers Cotton,
 
 the context was agricultural. Duggan furnished feed grain to a livestock company whose accounts receivable and personal property were the subject of a perfected security interest held by a credit association. In accordance with its standard practice, the association financed the livestock company’s operations by paying sight drafts given creditors by the livestock company. Duggan continued deliveries while an unsuccessful effort to sell the livestock company was overseen by the credit association. Cattle fed with Duggan’s grain were sold and the proceeds paid to the credit association, which also received payment for feedlot services given cattle awaiting slaughter. When the livestock company became financially unable to pay Duggan, suit was brought against the association.
 

 The Colorado Supreme Court upheld the lower courts’ determination that Duggan could obtain restitution from the credit association notwithstanding the latter’s superior statutory priority as a secured creditor. It opened its analysis by noting that the central issue “. . . whether a creditor that holds a perfected security interest in collateral can be held liable to an unsecured creditor based on a theory of unjust enrichment for benefits that enhance the value of the collateral . . . cannot be answered categorically.”
 
 (Duggan, supra,
 
 821 P.2d at p. 793.) Recognizing that this problem presented “obvious tension between the doctrine of unjust enrichment and the priority system established by Article 9,” the court reviewed the relevant decisions and discerned that the “central point of distinction . . . is the extent to which the secured creditor was involved in the transaction by which the unsecured creditor supplied goods or services that enhanced the value of the secured collateral.”
 
 (Id.
 
 at pp. 795-797.) Acknowledging that the Uniform Commercial Code’s priority system “reflects the legislative judgment that the value of a predictable system of priorities ordinarily outweighs the disadvantage of
 
 *1363
 
 the system’s occasional inequities,” the court formulated this rule: “In a situation where a secured creditor initiates or encourages transactions between the debtor and suppliers of goods or services, and benefits from the goods or services supplied to produce such debts, equitable principles require that the secured creditor compensate even an unsecured creditor to avoid being unjustly enriched. The equitable claim is at its strongest when the goods or services are necessary to preserve the security, as in
 
 Producers Cotton Oil."
 

 [6]
 

 (Id.
 
 at pp. 797-798.)
 

 Producers Cotton
 
 and
 
 Duggan
 
 have been subjected to critical comment, some of which is unusually hostile.
 
 [7]
 
 Were we the first California court to consider the issue, we might well agree with the strict position that allowing restitution claims would be incompatible with the code’s priority system. The primary purpose and chief benefit of article 9 is the stability and certainty provided by those rules. (E.g.,
 
 Duggan, supra,
 
 821 P.2d at p. 797; 2 White & Summers,
 
 op. cit. supra,
 
 § 26-20, p. 555.) These are significant policy considerations which should not be disregarded lightly. So weighty is their value that most courts and commentators agree that it is better to accept the occasional “harsh application of the law than to disrupt thousands of other transactions by injecting uncertainty and by encouraging swarms of potential litigants and their lawyers to challenge what would otherwise be clear and fair rules.” (2 White & Summers,
 
 supra,
 
 at pp. 554-555;
 
 Peerless Packing Co.
 
 v.
 
 Malone & Hyde, supra,
 
 376 S.E.2d at p. 164.) Any other approach threatens to “render the secured creditor status useless”
 
 (SMP Sales Management, Inc.
 
 v.
 
 Fleet Credit Corp., supra,
 
 960 F.2d at p. 560) and thus badly impair the utility of the article 9 framework.
 

 But we do not come to this subject with a blank screen. As evidenced by
 
 Producers Cotton,
 
 California has opted to allow restitution
 
 *1364
 
 claims against a secured creditor. When properly restricted to a very limited class of cases, this principle is sound.
 

 The reasons supporting the primacy of the article 9 scheme are unquestionably weighty. Article 9 has been in place for more than three decades. Its requirements are by now familiar and integrated into commercial practice. The corresponding benefit is the stability that is essential to a healthy business climate. Compliance with the obligations of article 9 should have a positive consequence.
 

 A secured creditor which has complied with all relevant code requirements to perfect its security interest, should therefore start with something like a presumption in its favor. The whole point of article 9 is to establish a comprehensive scheme affording maximum protection to the secured creditor who has followed its provisions. (See code comrs. off. note, Deering’s Ann. Cal. U. Com. Code, § 9101 (1986 ed.) pp. 385-387; 23C West’s Ann. Cal. U. Com. Code, § 9101 (1990 ed.) pp. 288-290.) This does not, of course, guarantee payment in full. Even a secured creditor which has perfected its security interest may be subordinated to another of like status which is chronologically senior, or to other specified classes of creditors, the most prominent of which are those having a purchase money security interest
 
 [8]
 
 (see § 9312). But, having taken the trouble to satisfy all statutory requirements for protecting its interest, a secured creditor is entitled to a rebuttable preference for payment as against a creditor who has not demonstrated a similar compliance.
 

 This preference would be reinforced by the failure of the unsecured creditor to use various nonstatutory protections. As courts and commentators have noted, the unsecured creditor could have (1) demanded cash payment on delivery, (2) perfected a purchase money security interest (see fn. 8,
 
 ante),
 
 (3) checked with the appropriate governmental office to determine if the debtor had already granted a security interest posing a possible threat to repayment, or (4) obtained a secured creditor’s agreement to subordinate its priority (§ 9312). (See
 
 Peerless Packing Co.
 
 v.
 
 Malone & Hyde, supra,
 
 376 S.E.2d at p. 164; Clark,
 
 op. cit. supra
 
 (1992 supp.) § 3.18, p. S3-38.)
 

 But victory for a secured creditor is not an immutable law of nature. Fraud, for example, is expressly put beyond the pale. (See § 1103; fn. 5,
 
 *1365
 

 ante.)
 
 A code may strive for comprehensiveness, but exceptional situations will arise. Equity is ordinarily meant to operate in these situations (e.g.,
 
 Estate of Lankershim
 
 (1936) 6 Cal.2d 568, 572-573 [58 P.2d 1282]), but its operation is subject to the principle that “equity follows the law.”
 
 (English
 
 v.
 
 Olympic Auditorium, Inc.
 
 (1933) 217 Cal. 631, 641 [20 P.2d 946, 87 A.L.R. 1281].) This deference requires that equitable exceptions to statutory law be carefiilly limited to reduce any possible conflict with an express statutory command. (Cf.
 
 Pacific Scene, Inc.
 
 v.
 
 Penasquitos, Inc.
 
 (1988) 46 Cal.3d 407, 414 [250 Cal.Rptr. 651, 758 P.2d 1182].)
 
 Producers Cotton
 
 and
 
 Duggan
 
 show how this may be accomplished.
 

 Those decisions begin with the premise that simply pointing to benefit realized by the secured creditor will not suffice. As
 
 Duggan
 
 notes, gain to the creditor is almost universally present.
 
 (Duggan, supra,
 
 821 P.2d at p. 797.) Something more is required to displace the creditor’s favored position. That something is either conduct by the secured creditor or the nature of the unsecured creditor’s contribution to the collateral.
 

 What the
 
 Duggan
 
 court termed “the extent to which the secured creditor was involved in the transaction by which the unsecured creditor supplied goods or services” (Duggan,
 
 supra,
 
 821 P.2d at p. 797) can take many forms. At one end of the scale is fraud, which in its myriad forms is “die very essence of wrong; conduct that has always been and always will be wrong, according to the common judgment of mankind; conduct that cannot be dressed up or manipulated or associated so as to invest it with any element of right.”
 
 (Morton
 
 v.
 
 Petitt
 
 (1938) 124 Ohio St. 241 [177 N.E. 591, 593].) The California Uniform Commercial Code gives it no sanction (§ 1103) and courts applying the Uniform Commercial Code are equally stem. (See fn. 5,
 
 ante.)
 

 Harder to resolve are the less egregious situations “where a secured creditor initiates or encourages transactions between the debtor and suppliers of goods or services, and benefits from the goods or services supplied to produce such debts.”
 
 (Duggan, supra,
 
 821 P.2d at p. 798.) These situations present a fertile opportunity for trapping the unwary. If what the secured creditor did or failed to do can be reached by the doctrines of estoppel, misrepresentation not amounting to fraud, or mistake, the code allows redress to an innocent supplier (§ 1103). Just as contribution among tortfeasors is proportioned by fault
 
 (Tech-Bilt, Inc.
 
 v.
 
 Woodward-Clyde & Associates
 
 (1985) 38 Cal.3d 488, 495 [213 Cal.Rptr. 256, 698 P.2d 159]), commercial loss allocation responds to the same impulse. If it had an active hand in promoting a transaction that goes bad, a secured creditor should not escape with a victimized supplier left behind holding an empty bag alone. In simple terms, the creditor should not be allowed to profit from the wrong of its own bad faith. (Cf. § 1203; Civ. Code, § 3517.)
 

 
 *1366
 
 The most difficult factor is the secured creditor’s acquiescence when an unsecured creditor provides goods or services to their common debtor. First raised in
 
 Producers Cotton,
 
 it was given a restrictive gloss by
 
 Duggan:
 
 “In
 
 Producers Cotton Oil
 
 the court held that the secured creditor’s act of acquiescing in the harvesting of the secured collateral (crops) was a sufficient basis for holding the secured creditor liable on the theory of unjust enrichment. However, in that case, the harvesting was necessary to the actual
 
 preservation
 
 of the secured collateral. . . . Here, the delivery of corn was not essential to preserve the secured collateral, but instead served to augment or enhance its value. In such a case, more than mere acquiescence is required to hold a secured creditor liable on the basis of unjust enrichment.”
 
 (Duggan, supra,
 
 821 P.2d at p. 797, fn. 17 [original italics and citation omitted].) Subject to two reservations, we agree with this reasoning, which is sound and reflective of commercial realities.
 

 When an unsecured creditor provides goods or services that are necessary to preserve the collateral, this is an expense the secured creditor would ordinarily incur as part of the duty to use “reasonable care in the custody and preservation of collateral in his possession” (§ 9207, subd. (1)). This would be especially true in situations like
 
 Producers Cotton
 
 and
 
 Duggan,
 
 where the collateral is perishable. In such a case the unsecured status of the creditor appears less important than the fact that the secured creditor directly benefits from expenditures the creditor is spared having to make on its own behalf. Matters become less clear when the unsecured creditor’s expenditures are not essential but merely useful, in the sense that the collateral available for liquidation is being increased.
 

 One of the notable features of article 9 is its approval of the concept of the so-called “floating lien” generated by security interests extending to after-acquired debtor property. This measure of creditor protection is vital to the feasibility of long-term procedures such as inventory, accounts receivable, or agriculture crop financing. (See §§ 9108, 9204; 2 White & Summers,
 
 op. cit. supra,
 
 § 25-6, pp. 435-442.) Risk to other creditors is inherent in the operation of this mechanism (see Jackson & Kronman,
 
 Secured Financing and Priorities Among Creditors
 
 (1978) 88 Yale L.J. 1143, 1166), whose utility would be severely impaired if unsecured additions to the protected collateral could be excluded from its reach. Virtually every addition will augment or enhance the value of the pool of collateral already pledged to the secured creditor. Unless the unsecured creditor uses one of the means the code permits to ensure payment, the risk of loss must be deemed a cost of doing business (cf. § 9207, subd. (2)(c)). This is the defining characteristic of a perfected security interest—“the degree to which it insulates the secured party from the claims of the debtor’s other creditors.” (Jackson & Kronman,
 
 supra,
 
 88 Yale L.J. at p. 1143.) The mere fact of augmenting or enhancing
 
 *1367
 
 the collateral’s value is by itself insufficiently notable to justify special equitable protection from article 9’s priority structure. If allowed, this exception would swallow the rule.
 

 The same is true concerning a secured creditor’s acquiescence to such collateral pool augmentations. If acquiescence is to carry the risk of restitution liability, the secured creditor cannot afford silence. The creditor would be compelled to advise those who might deal with the debtor of the security arrangement and to disclaim responsibility for any obligation incurred by the debtor.
 
 [9]
 
 In order to know to whom these warnings must be given, the creditor would have to keep close tabs on the debtor’s business dealings. Regardless of whether such a monitoring regime could overcome objections of cost, intrusiveness, and ineffectiveness, its conclusive flaw is that it would negate the utility of article 9’s notice-filing system. One of the primary benefits of that system is that filing a financing statement relieves the now-secured creditor from the necessity of taking further action to protect its security interest; thereafter prospective creditors must watch out for themselves by checking the filings. Basing unjust enrichment liability on acquiescence would turn the filing system on its head, destroying existing creditors’ reliance on that system and substituting a prospective creditor’s duty to check with a new duty to warn and disclaim imposed on existing creditors. It would in plain effect reward ignorance and establish an incentive for ignoring the filing system. Acquiescence liability, because it would upend article 9’s interlocking notice-filing and priority provisions, cannot be accepted.
 

 How does the evidence in this case measure up according to this legal template? Nothing in Phoenix’s conduct amounted to fraud, actual or virtual (see fn. 5,
 
 ante),
 
 and Knox does not contend otherwise.
 

 The transaction between Knox and Domaine owed nothing to Phoenix in its inception. The contract for the barrels makes no reference to Phoenix, and was executed prior to Domaine’s agreement with Phoenix. The barrels were ordered by Domaine, they were shipped to Domaine, and Knox initially looked to Domaine for payment. In light of Knox’s testimony that he had no knowledge of Phoenix at the time he made the contract with Domaine, he could not have had any expectation of payment from Phoenix. The transaction between Knox and Domaine being in place and under way before Phoenix made any appearance, it is impossible to say that Phoenix initiated it. Similarly, the sole circumstance that Knox was paid for the first shipment with a check from Phoenix does not establish that Phoenix encouraged the
 
 *1368
 
 deal; the course of performance under the Knox-Domaine contract owed nothing to anything said or done by Phoenix, or to the fact that Phoenix would be the true source of Domaine’s payment to Knox. Phoenix never asked Knox to provide anything. (Cf.
 
 Earhart
 
 v.
 
 William Low Co.
 
 (1979) 25 Cal.3d 503, 511-515 [158 Cal.Rptr. 887, 600 P.2d 1344].)
 

 We have already determined that any acquiescence by Phoenix will not support restitution liability. Phoenix had no duty to overcome the failure of Knox, a merchant knowledgeable about article 9 procedures,
 
 [10]
 
 to acquaint himself with public information concerning the Phoenix-Domaine relationship.
 

 The barrels provided by Knox were not necessary to preserve the collateral covered by Phoenix’s security interest in Domaine’s “after acquired” property. The mere fact that the secured collateral was enhanced by the addition of the barrels does not support liability in these circumstances.
 

 The trial court’s conclusion has an undeniable common sense allure— Knox provided barrels; Phoenix ended up with the barrels; Phoenix should therefore pay Knox for their value. Ordinarily this would be sound reasoning supporting an equitable result. Article 9, however, compels a different conclusion. Phoenix complied with statutory provisions intended to immunize secured creditors from such claims in all but the rarest of cases. As this is not that sort of case, the equitable impulse for restitution must yield to the Legislature’s command.
 
 (Pacific Scene, Inc.
 
 v.
 
 Penasquitos, Inc., supra,
 
 46 Cal.3d at p. 414;
 
 English
 
 v.
 
 Olympic Auditorium, Inc., supra,
 
 217 Cal. at p. 641.)
 

 II
 
 *
 

 The judgment is reversed.
 

 Anderson, P. J., and Reardon, J., concurred.
 

 A petition for a rehearing was denied November 22, 1994.
 

 [1]
 

 Statutory references are to this code unless otherwise indicated.
 

 [2]
 

 Phoenix advanced Domaine approximately $1.1 million, but recovered only about $400,000 from the liquidation.
 

 After Domaine filed for bankruptcy protection in about February of 1991 Knox filed a claim for the second shipment. He testified that just prior to trial he received “a little down, or something” from “the chapter eleven receiver.” In its judgment the trial court ordered Knox’s recovery reduced by “any sum paid ... by the Bankruptcy Court in the pending bankruptcy proceeding” for Domaine.
 

 [3]
 

 Knox disputes Phoenix’s ability to bring the code argument before us, claiming that Phoenix did not reassert it as an affirmative defense to Knox’s amended complaint and “never raised this secured creditor issue at trial.” Because Phoenix did raise the issue in its motion for judgment of the pleadings, the argument was preserved for appeal. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 313, p. 324.)
 

 In light of our ultimate decision that Knox has not shown that he is entitled to prevail, and in fairness to the trial court, it should be noted that the trial court could not have granted Phoenix’s motion. “In ruling on a motion for judgment on the pleadings, as in the case of a general demurrer, the court is confined to the facts alleged in the pleading attacked. ... A motion for judgment on the pleadings, like a general demurrer, challenges the sufficiency of the plaintiff’s cause of action and raises the legal issue, regardless of the existence of triable issues of fact, of whether the complaint states a cause of action.”
 
 (Brownell
 
 v.
 
 Los Angeles Unified School Dist.
 
 (1992) 4 Cal.App.4th 787, 792-793 [5 Cal.Rptr.2d 756]; see Code Civ. Proc., § 438, subd. (d).) Knox’s complaint was good enough to state a cause of action; it took the introduction of evidence at the ensuing trial to disclose the legal deficiency identified by Phoenix in its motion.
 

 [4]
 

 Such terms express the same principle and are functionally interchangeable. (See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 91, p. 122.)
 

 [5]
 

 A
 
 process which works both ways. Even courts in the majority camp acknowledge that a secured creditor should not expect to escape liability after committing either actual or virtual fraud
 
 (Peerless Packing Co.
 
 v.
 
 Malone & Hyde, supra,
 
 376 S.E.2d at pp. 161-165, fn. 4), especially if the issue can be presented as involving priorities among creditors. (See authorities cited in
 
 Ninth Dist. Prod. Credit
 
 v.
 
 Ed Duggan, supra,
 
 821 P.2d at pp. 797-798.)
 

 [6]
 

 Stated negatively, the court’s rule is that “Where a secured creditor does not itself initiate or encourage the transaction that creates the unsecured obligation giving rise to the unjust enrichment claim, retention of any benefit realized by the secured creditor without compensating the supplier is not unjust and thus an unjust enrichment claim cannot be supported.”
 
 (Duggan, supra,
 
 821 P.2d at p. 797, fn. omitted.)
 

 [7]
 

 The authors of the leading treatise on the Uniform Commercial Code—who disagree between themselves as to the proper scope for equitable considerations—list
 
 Producers Cotton
 
 and
 
 Duggan
 
 in a section entitled “Weird Cases: The Creeping Infestation of Article Nine Priority Rules by ‘Principles of Law and Equity.’ ” (2 White & Summers, Uniform Commercial Code (3d pract. ed. 1988) § 26-20, pp. 554-555;
 
 id.
 
 (1993 supp.) pp. 160-164; see also Summers,
 
 General Equitable Principles Under Section 1-103 of the Uniform Commercial Code
 
 (1978) 72 Nw. U.L.Rev. 906 [favoring broad application of equity].)
 

 The author of a treatise on secured transactions excoriates
 
 Duggan
 
 in particular as an “aberration” that is not only “flat wrong” but “makes the mind spin,” “turns the world upside down,” and “should send chills down the backs of secured lenders everywhere.” (Clark, The Law of Secured Transactions Under the Uniform Commercial Code (1993 supp.) § 3.14, pp. S3-35-S3-39.)
 

 [8]
 

 A purchase money security interest can be held by a creditor who either sells the collateral to the creditor or finances acquisition of the collateral by the creditor (§ 9107). A purchase money security interest can be perfected after the debtor’s receipt of the collateral and still have priority over the holder of a general security interest in the same collateral claiming pursuant to an “after acquired” property clause (§§ 9301, subd. (2), 9312, subds. (3)-(5)). We have discussed the purchase money security interest because it is what Knox could have obtained to protect his sale to Domaine.
 

 [9]
 

 The
 
 Duggan
 
 court appears to have endorsed a creditor’s need to “inform[] ... the proper parties of its intent not to pay for debts incurred in maintaining, enhancing, or making additions to secured collateral” in order to “protect itself from unjust enrichment claims.”
 
 (Duggan, supra,
 
 821 P.2d at p. 798.) For the reasons stated in the text, we do not agree with this part of
 
 Duggan.
 

 [10]
 

 Although Knox testified at trial that he knew he could have filed a financing statement to protect his purchase money security interest, as he had done in the past, Phoenix showed that he did not do so for this transaction until February of 1991, the month Domaine became involved in bankruptcy proceedings.
 

 *
 

 See footnote,
 
 ante,
 
 page 1357.