**In re PACKAGE DESIGN & SUPPLY CO., INC., Debtor.**

**Bankruptcy No. 97–13840 K.**

United States Bankruptcy Court,
W.D. New York.

Feb. 12, 1998.

Daniel J. Hartman, Pack, Hartman, Ball, Brody & Kinney, P.C., Buffalo, NY, for Citibank.

Terry C. Burton, Cheektowaga, NY, for Debtor.

William P. Keefer, Albrecht, Maguire, Heffern & Gregg, P.C., Buffalo, NY, for Philpac Corp.

MICHAEL J. KAPLAN, Bankruptcy Judge.

This matter is before the Court on Citibank's motion to approve a cash collateral agreement giving Citibank a lien on postpetition accounts and inventory. The motion squarely presents the question of how 11 U.S.C. § 552 may result in a secured lender's loss of lien if action is not taken promptly in bankruptcy court after the filing of a Chapter 11 petition.

The Debtor in this case has been operating as a Chapter 11 debtor-in-possession since June of 1997, manufacturing corrugated car-

tons and foam products and distributing those and other packaging supplies. Tens of thousands of dollars of receivables are generated each month. In December, 1997, six months after filing, the Debtor and its prepetition secured lender, Citibank, sought approval of a cash collateral agreement under which Citibank would receive a lien on postpetition accounts and inventory in a dollar amount equal to the value of the collateral in place at the time of the filing of the petition. This was opposed by the United States Trustee and by an unsecured creditor who cited the popular wisdom (indeed a venerable proposition) to the effect that a secured creditor that does not act promptly to obtain a cash collateral agreement under 11 U.S.C. §§ 364 or 552(b) may see its collateral "roll out from under" the lien by operation of 11 U.S.C. § 552(a). This proposition is often intuited, and rarely analyzed.

If, in fact, Citibank's collateral has rolled out from underneath the lien during the first six months of this case, then the present cash collateral proposal simply gives away unencumbered assets that would otherwise be available for the payment of administrative expenses [1] and unsecured debt, to enhance Citibank's security.[2]

The matter has been briefed. The popular wisdom regarding a roll-out of cash collateral and floating liens must be reconciled with the undeniable fact that under the Uniform Commercial Code ("U.C.C."), second generation proceeds of liened proceeds are merely "proceeds of proceeds" [3] and are subject to the initial lien without regard to any "after-acquired property" clause, where such second generation assets are identifiable as such.[4] We must specify the point at which a lender which has a prepetition lien on all assets of the borrower and all proceeds thereof, may have lost its lien entirely after even a brief period of operation by the borrower under Chapter 11.

Though such a roll-out is very possible, it does not seem to have occurred here where there appears to have been no unencumbered assets as of the time of the Chapter 11 filing, and there appear to be no postpetition obligations or assets that have not been fully satisfied by use of Citibank's cash collateral.[5]

Examination of the statutory authority, and certain fundamentals, and the illustration provided by the particular facts presented in the leading case of *Creditors Committee v. Marepcon Financial (In re Bumper Sales),* 907 F.2d 1430 (4th Cir.1990), illuminate the matter.

1.

First, the statutory authority and legislative history. Section 552 of the Bankruptcy Code deals with the postpetition effect of security interests. Specifically it provides:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the com-

---

**1.** As discussed below, 11 U.S.C. § 506(c) may assist some administrative expense claimants, though not others. *See In re Flagstaff Foodservice Corp.,* 29 B.R. 215, 219 (Bankr.S.D.N.Y. 1983).

**2.** Citibank apparently has an undisputed perfected lien on equipment, which, at a going concern value leaves Citibank fully secured. But if the worst should happen and the reorganization should fail, then at liquidation values Citibank may be undersecured, unless it succeeds on the present motion.

**3.** *See* N.Y.U.C.C. § 9–306(1) (McKinney 1990); *see also* 9 Anderson on the Uniform Commercial Code § 9–306:63 at 275 & n. 253 (3d ed. 1994) ·

("There is no limit on the number of steps through which the creditor can follow the collateral as long as it is possible to trace from one step to another.")

**4.** *See, e.g., Creditors Committee v. Marepcon Financial (In re Bumper Sales, Inc.),* 907 F.2d 1430 (4th Cir.1990).

**5.** A third key factor that was not addressed in the papers, and must be the subject of further inquiry, is the question of whether there was equity for unsecured creditors in existence at the time of filing such that a grant of the present motion would erode funds otherwise available for unsecured creditors. *See* discussion *infra.*

mencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to *proceeds, product, offspring, or profits of such property,* then such security interest extends to such proceeds, product, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by *applicable nonbankruptcy law, except to any extent that the court,* after notice and a hearing and *based on the equities of the case, orders otherwise.*

11 U.S.C. § 552 (1993 & Supp.1997) (emphasis added).

The New York U.C.C. defines proceeds as,

*whatever is received upon sale,* exchange, collection *or other disposition* of collateral or *proceeds....* Money, checks, deposit accounts, and the like are "cash proceeds". All other proceeds are "non-cash proceeds."

N.Y.U.C.C. § 9–306(1) (McKinney 1990) (emphasis added).[6]

Although § 552 specifically invokes "applicable nonbankruptcy law" in limiting the scope of "proceeds" of collateral, the legislative history to § 552 is often quoted as saying that "[t]he term 'proceeds' is not limited to the technical definition of that term in the U.C.C., but covers any property into which property subject to the security interest is converted," H.R.Rep. No. 95–595 (1977), at 377, *reprinted in* Appendix C, Collier on Bankruptcy, App. Pt. 4(d)(i), at App. Pt. 4–1417 (Lawrence P. King ed. 1996). This

seeming contradiction can be reconciled by a look at the version of H.R. 8200 which the House Report was written to accompany. That version of the bill did not mention "applicable nonbankruptcy law;" rather, "proceeds" were defined by the terms of the security agreement alone "except to the extent that the state acquired such proceeds...to the prejudice of other creditors holding unsecured claims." H.R. 8200, 95th Cong. (1977), *reprinted in* Appendix B, Collier on Bankruptcy, App. Pt. 4(d), at App. Pt. 4–941 to 942 (Lawrence P. King ed. 1996). The numerous cases[7] that gave some weight to that legislative history so as to construe § 552 more broadly than the technical definitions in the U.C.C. apparently overlooked this fact, as consequently may have reached the right result, on the wrong basis.

While it appears to this writer that one must surely begin with the strict, technical definition of "proceeds" contained in N.Y.U.C.C. § 9–306(1), considerable flexibility is provided by § 552(b)'s explicit safety valve—"except to any extent that the court, after notice and a hearing based on the equities of the case, orders otherwise"[8]—and not by the legislative history.[9]

### 2.

▄▄▄ Next, certain fundamentals. The after-acquired property clause, or "floating lien," serves at least two critical purposes; two sides of one coin. First, the clause eliminates the need to wrestle with the distinction between proceeds and after-acquired property, which distinction hinges largely on the lienor's ability to trace specific proceeds into identifiable second generation property.

---

**6.** For reasons set forth in *In re Hugo,* 58 B.R. 903 (Bankr.E.D.Mich.1986), U.C.C. § 9–306(4) does not apply under these circumstances, even though that section specifically addresses insolvency proceedings.

**7.** *See, e.g., Great–West Life & Annuity v. Parke Imperial Canton, Ltd.,* 177 B.R. 843, 851 (N.D.Ohio 1994) (finding U.C.C. definition of proceeds to be inapplicable in § 552 context); *In re Megamarket,* 207 B.R. 527, 530 (Bankr. E.D.Ky.1997); *Brever v. State Bank (In re Kohls),* 94 B.R. 1006, 1010 n. 8 (Bankr.D.Minn.1987); *In re Sunberg,* 35 B.R. 777, 784 (Bankr.S.D.Iowa 1983), *aff'd,* 729 F.2d 561 (8th Cir.1984); *see*

*also* 5 Collier on Bankruptcy ¶ 55202[2], at n. 8 (Lawrence P. King ed.1997).

**8.** *See, e.g., In re Wynnewood House Assoc.,* 121 B.R. 716, 727 (Bankr.E.D.Pa.1990); *In re Hofstee,* 88 B.R. 308, 313 (Bankr.E.D.Wash.1988), *aff'd,* 116 B.R. 872 (9th Cir. BAP 1990); *In re Kain,* 86 B.R. 506, 512–13 (Bankr.W.D.Mich. 1988); *George v. Farmers Home Admin., (In re George),* 62 B.R. 671, 673 (Bankr.C.D.Ill.1986), *aff'd,* 78 B.R. 886 (C.D.Ill.1987); *United States v. Van Vactor et al. (In re Crouch),* 51 B.R. 331, 332 (Bankr.D.Or.1985).

**9.** The legislative history is best analyzed by *New Hampshire v. Cross Baking Co. (In re Cross Baking),* 818 F.2d 1027, 1033 (1st Cir.1987).

Traceability and identifiability are irrelevant when a lienor has a lien on all after-acquired property, unless the supplier of the after-acquired property remained unpaid and enjoyed its own protection under the U.C.C.[10] The other key purpose related to the first is the fact that a duly perfected after-acquired property clause under Article 9 of the U.C.C.[11] essentially makes a gift to the lienor of any collateral that the debtor acquires or improves at the expense of someone else.[12] Hence, outside bankruptcy, even if all of the debtor's inventory was delivered to the debtor by suppliers who remained unpaid, the inventory now "belongs" to the lienor up to the amount of the debt, in the absence of perfection of some other superior lien in favor of the supplier. Indeed, no matter the nature or form of the value added by other creditors outside bankruptcy, or by the labors of the debtor, or by the debtor's workforce, etc., it all inures to the benefit of the lienor by virtue of the after-acquired property clause, without the need to resort to the question of whether the current state of the collateral is or is not "proceeds." Even if the creditor that polished a glass plug into a perfect telescope mirror remains unpaid, the enhanced value of the resulting inventory inures to the benefit of the lienor, outside bankruptcy. What was raw material is now inventory, whether it was after-acquired property, or merely proceeds.[13]

■ In bankruptcy, however, 11 U.S.C. § 552(a) absolutely and unequivocally extinguishes after-acquired property clauses upon the filing of a petition in bankruptcy (except as to room rentals in hotels, motels, or other lodging properties). Subsection (b) of § 552

continues the ability of the lienor to follow the proceeds of a lien on prepetition assets on into the bankruptcy case. Sections 552(a) and (b) together would result in the need to wrestle with the sometimes intractable distinction between proceeds and after-acquired property, were it not for the ability provided by the explicit language of subsection (b), to look to the "equities of the case." Together with 11 U.S.C. § 506(c), that ability helps to assure that those who enhance the value of collateral during a bankruptcy case will not lose out to a lien on the "proceeds" thus enhanced.[14]

■ Unless there is postpetition secured lending by the prepetition lienor under 11 U.S.C. § 364 under terms which include an after-acquired property clause, or unless some other order of the court approves the continuation of such a clause, the lienor loses critical benefits that the after-acquired property clause gave it. To succeed in following its collateral into a reorganization case under § 552(b) under such circumstances, it must be able to trace its proceeds. It cannot, however, enjoy the value added by others, without a limit established by § 506(c) and the "equities" clause. The question of value-added may often be distinct from the question of whether collateral may totally "roll out" from under a lien and leave an otherwise secured creditor unsecured. But the crux of the "roll-out" problem is that the *consequences* of added value may cause a commingling or other traceability problem that destroys the lien entirely.

A paradigmatic case of the value-added argument arises in dairy farm cases. The lender who has a lien on all of the farmer's

---

10. For example, a supplier can protect its interests by perfecting a purchase money security interest ("PMSI") under U.C.C. § 9–312(3), or enjoy protection for "accessions" under U.C.C. § 9–314, or for commingled goods under U.C.C. § 9–315.

11. *See* N.Y.U.C.C. § 9–306(3) (McKinney 1990).

12. This is subject to the same exceptions illustrated in footnote 10, *supra*.

13. Although at least one case recognized an "unjust enrichment" under analogous circumstances, the proposition that Article 9 of the U.C.C. does not supplant the common law "unjust enrichment" doctrine has been soundly de-

nounced by other courts. *Compare Ninth District Production Credit Assoc. v. Ed Duggan, Inc.*, 821 P.2d 788 (Sup.Ct.Colo.1991), *with Knox v. Phoenix Leasing, Inc.*, 29 Cal.App.4th 1357, 35 Cal.Rptr.2d 141 (1st Dist.1994) (criticizing *Duggan* ).

14. Section 552(b) subordinates itself to the provisions of § 506(c) and § 506(c) helps to define the application of the "equities" clause. *See Kain*, 86 B.R. at 513 & n. 23; *In re Vanasdale*, 71 B.R. 270, 272 (Bankr.N.D.Ohio 1987); *Crouch*, 51 B.R. at 332–33. In my view, the two work together and complement each other.

prepetition assets, e.g., the land, the herd, all equipment, the crops, the silage, the milk check, etc., usually argues that it has a lien on 100% of the proceeds of milk that is produced after the filing of the petition because the milk could not be produced without the use of the lender's collateral. The farmer, on the other hand, usually argues that the lender has no lien at all on such milk, because the milk is produced entirely by the value added by his or her labors. The intrinsic difficulties of such a problem promote settlement or the adoption of judge-made rules of administrative convenience.[15] The result does not typically leave the lender with no lien at all, but rather typically assures a § 506(c) contribution, or an equitable charge against the § 552 lien, and leaves some funds that can be put towards a reorganization effort.[16]

Debtors that are manufacturers, retailers, or the like, pose an easier problem because it is often possible to separately determine the value, for example, of raw materials as opposed to work in progress, as opposed to finished goods in inventory, as opposed to accounts receivable, and thereby determine the value added (or lost) at each step throughout the process. But where value is being added by other creditors who are unpaid for the postpetition value added, or by the use of unencumbered assets, the commingling of "proceeds of the lender's proceeds" with proceeds that are the fruits of value added by others diminishes the ability of the secured creditor to trace its proceeds through to the next generation of assets while at the same time respecting the fact that it cannot claim all of the value added by others.

### 3.

This points us lastly to the importance of facts. The reason that the court in the case of *Creditors Committee v. Marepcon Financial (In re Bumper Sales, Inc.)*, 907 F.2d 1430 (4th Cir.1990), was entirely correct in approving the grant of a second generation postpetition lien to the lender under § 552(b)

and the U.C.C., was the specific fact pattern before the court, which fact pattern was emphasized repeatedly. The court stated:

> The parties stipulated that, during the post-petition period, Bumper Sales did not borrow any outside funds or incur any outside debt; that Bumper Sales used *only* [the lender's] cash collateral—the cash proceeds of inventory secured under [the lender's] security interest—to finance new inventory ...

*Bumper Sales*, 907 F.2d at 1433 (emphasis added).

> [T]here is no doubt that the cash proceeds are identifiable, because the parties have stipulated that Bumper Sales used only these cash proceeds to finance its operations during bankruptcy. Since only these proceeds were used, they are conclusively identifiable.

*Id.* at 1437.

> The only requirement is that the second generation proceeds be traceable to the original collateral, which, as discussed above, the parties have stipulated is true in this case.

*Id.* at 1439.

> [T]he post-petition inventory was produced entirely with the proceeds of [the lender's] pre-petition collateral, not with any of the debtor's unencumbered assets to which ... unsecured creditors ... might have had a claim in bankruptcy.

*Id.* at 1439 n. 12.

In sum, all of the value added by others was completely paid for by the lender's collateral, and only by the lender's collateral, without reference to an after-acquired property clause. That fact pattern may not be as uncommon in small Chapter 11 cases like this, as it may seem at first blush. It is typical for trade suppliers to put small Chapter 11 debtors-in-possession on a cash-on-delivery ("C.O.D.") basis and it is typical of bankruptcy courts to require even a large Chapter 11 debtor-in-possession to remain

---

15. *See In re Delbridge*, 61 B.R. 484, 489–91 (Bankr.E.D.Mich.1986) (establishing mathematical formula to determine lender's interest in milk versus farmer's expenses in producing milk).

16. *See In re Vanasdale*, 64 B.R. 92, 97 (Bankr. N.D.Ohio 1986) (explaining relationship between §§ 506(c) and 552(b)).

current on payroll, payroll taxes, utilities and all other ordinary costs of doing business. If this, in fact, is being done, and is being done exclusively through the use of a prepetition lender's cash collateral, then the collateral might not roll out from under the lien and the tardily-sought grant of a lien on postpetition assets may be granted.

■ In the case at Bar, the *Bumper* fact pattern seems to exist. It seems clear that Citibank had a perfected lien on every asset of the Debtor. It appears that none of the Debtor's present assets were enhanced by postpetition extensions of credit by others (at least none that have not since been repaid with Citibank's cash collateral), or enhanced by some unencumbered cash infusion, or the like. A further proffer will be required to be certain of this, as well as of any question of unencumbered equity that might be inequitably lost to unsecured creditors if this motion is granted.

### CONCLUSION

Returning, now, to the original question. Under what circumstances may collateral roll out completely from under the floating lien after the Chapter 11 filing, in light of black letter law under the U.C.C. sustaining a lien in second generation collateral as a proceeds lien rather than as an after-acquired property lien?

One hypothetical assists. (This hypothetical may be very distinct from the facts of the present case: the facts of the present case are not set forth clearly in the papers; rather it is asserted in a conclusory fashion that the *Bumper* facts exist here.) Consider a high-volume retailer with a great many suppliers of inventory and a single lender with a perfected lien on all prepetition assets and the proceeds thereof, but the lender's after-acquired property clause was ended by 11 U.S.C. § 552(a). Some of the retailer's suppliers put the retailer on a C.O.D. basis (so, like *Bumper*, it pays for goods C.O.D. with the lender's cash collateral), but others provide goods on credit. The postpetition goods bought on credit are rapidly commingled with goods that (because they were purchased with cash collateral) are proceeds and second generation proceeds, and the rapidly-received cash from sales of both types of goods are commingled, and the commingled cash goes to the purchase of more goods for resale and for payment of overhead (rent, utility, taxes, etc.) that enables more sales and more credit, and so on. The failure to come to court quickly in such an instance leaves the lender with no lien at all because of unidentifiability. There are numerous other hypotheticals that lead to the same result, such as where the lender's lien did not encumber all prepetition assets and the unencumbered assets added significant value to what the lienor is claiming, or where postpetition assets were purchased with cash from equity available to unsecured creditors. Outside bankruptcy, an after-acquired property clause assists the lienor. But where 11 U.S.C. §§ 506(c) and 552 apply, the lienor may become completely unsecured.

The further proffer will be heard on February 25, 1998 at 10:00 a.m., on notice to the objectors, *i.e.* the U.S. Trustee and Philpac Corp., with regard to: (1) whether all assets were covered by the lien; (2) whether there are any unpaid administrative expense claims that would be prejudiced by grant of this motion; and (3) whether there was postpetition equity that made a contribution to the present value of the Debtor's assets.

SO ORDERED.