**In re MEGAMARKET OF LEXINGTON, INC., Debtor.**

**Bankruptcy No. 94–50675.**

United States Bankruptcy Court,
E.D. Kentucky,
Lexington Division.

Jan. 17, 1997.

Frank T. Becker, Lexington, KY, for Debtor.

Robert J. Brown, Lexington, KY, Trustee.

Michael R. Pasley, Nashville, TN, for Fleming Companies, Inc.

## ORDER

JOE LEE, Chief Judge.

In conformity with the memorandum opinion of the court this day entered, IT IS ORDERED:

The motion of the trustee to abandon the estate's interest in the debtor's bank accounts is sustained. The motion of creditor Fleming Companies, Inc. to require the trustee to distribute to Fleming the funds in the debtor's bank accounts is sustained. The debtor's objection to the trustee's notice of abandonment is overruled.

This is a final and appealable order.

## MEMORANDUM OPINION

On December 22, 1994, Robert J. Brown, trustee for the estate of Megamarket of Lexington, Inc., filed a notice of abandonment of the estate's interest in certain bank accounts. As grounds for abandonment the trustee stated that the bank accounts are overencumbered by a consensual lien of Malone & Hyde (now known as Fleming Companies, Inc.), the statutory liens of certain wage claimants, and a tax lien of the Commonwealth of Kentucky Revenue Cabinet. The notice of abandonment recited that unless objections are filed within 20 days, the property shall be deemed abandoned when the case is closed. The debtor, by counsel, in a timely filed objection, stated that the estate's interest in the bank accounts should not be abandoned because the validity of Malone & Hyde/Fleming's security interest and the validity and amount of the tax lien are in dispute. Fleming filed a response to the debtor's objection and a motion to require the trustee to distribute the funds on deposit to Fleming. After a hearing on January 30, 1995, the trustee, the debtor, and Fleming, by counsel, agreed to submit the matter to the court on stipulated facts. The stipulation of facts was filed on June 19, 1995.

*FINDINGS OF FACT:*

The debtor, Megamarket of Lexington, Inc. ("Megamarket"), owned and operated two supermarket/grocery stores: a Megamarket store in Lexington, Kentucky and a Super One store in Richmond, Kentucky. Megamarket obtained start-up and operating capital from Malone and Hyde, Inc. or its affiliates or predecessors in interest, M & H Financial Corporation or M & H Food Companies, Inc. (hereinafter collectively referred to as "Malone & Hyde"), predecessors in interest to Fleming Companies, Inc. ("Fleming").[1]

On May 31, 1988, Megamarket executed two promissory notes in favor of M & H Financial Corporation evidencing an aggregate indebtedness in the principal amount of $2,685,585 ($2,185,585 + $500,000). The purpose of the loans was to finance the acquisition of equipment and inventory and to provide working capital for the Megamarket grocery store in Lexington. To secure repayment of the indebtedness, Megamarket executed a "Loan and Security Agreement" in which Megamarket granted to M & H Financial Corporation a security interest in its then-owned or thereafter acquired inventory, furnishings, fixtures, equipment, accounts, contract rights, instruments, leasehold improvements, general intangibles, and proceeds of the foregoing.

At various times Megamarket borrowed additional funds from Malone & Hyde for the purchase or lease of goods and services to be used in the Lexington store. To secure repayment of these obligations and all other outstanding indebtedness, Megamarket executed a security agreement dated September 4, 1991, granting to Malone & Hyde a security interest in all then-owned or thereafter acquired inventory, machinery, furniture, furnishings, equipment, and fixtures located at the Lexington store, and proceeds of the foregoing.

On December 4, 1991, Megamarket executed a promissory note in favor of Malone & Hyde, Inc. evidencing an indebtedness in the principal sum of $1,500,000. The purpose of this loan was to provide financing for the acquisition or start-up of the Super One grocery store in Richmond. To secure repayment of this and all indebtedness owed by Megamarket to Malone & Hyde, Megamarket executed a security agreement dated December 4, 1991, granting to Malone & Hyde, Inc. a security interest in its then-owned or thereafter acquired assets located at both stores, including its inventory, furniture, fixtures, leasehold improvements, equipment, accounts, and general intangibles[2], and proceeds of the foregoing.

---

1. The relationship between M & H Financial Corporation, M & H Food Companies, Inc., Malone & Hyde, Inc., and Fleming Companies, Inc. is not clear from the record, but does not appear to be at issue.

2. The security agreement dated December 4, 1991, covers, *inter alia:*
   (iv) all accounts, goods, documents, instruments, contract rights, and chattel paper (the "Accounts"), and (v) general intangibles, including without limitation, goodwill, inventions, designs, patents, trademarks or service

At various times Megamarket borrowed additional funds from Malone & Hyde for the purchase or lease of goods and services for use at its Richmond store. To secure repayment of these obligations as well as all other outstanding indebtedness, Megamarket executed a security agreement dated December 3, 1991, granting to Malone & Hyde a security interest in all then-owned or thereafter acquired inventory, machinery, furniture, furnishings, equipment, and fixtures located at the Richmond store, and proceeds of the foregoing.

It appears from the record that Malone & Hyde properly and timely filed UCC–1 financing statements to perfect and UCC–3 statements to continue the above-referenced security interests.

On April 4, 1994, as a result of Megamarket's deteriorating financial condition, Megamarket and Malone & Hyde executed an agreement styled "Borrower's Consent to Lender's Collection and Application of Accounts Receivable." By executing the agreement Megamarket acknowledged the validity and first priority of the security interest of Malone & Hyde in all of the debtor's assets then owned or thereafter acquired to secure repayment of all of the indebtedness owed by Megamarket to Malone & Hyde, and authorized Malone & Hyde to collect Megamarket's accounts receivable.

On April 7, 1994, Megamarket ceased operations. Thereafter Malone & Hyde enforced its security interest by taking possession of the remaining assets of Megamarket.

On May 5, 1994, three creditors holding unsecured claims commenced an involuntary case against Megamarket by filing a petition for relief under chapter 7 of the Bankruptcy Code. The debtor filed an answer on May 26, 1994 consenting to entry of an order for relief. On June 2, 1994 an order for relief was entered. Robert J. Brown was appointed trustee on June 6, 1994.

On June 29, 1994, Malone & Hyde sold to The Kroger Co. certain fixtures, equipment, and inventory that Malone & Hyde had repossessed prior to Megamarket's bankruptcy. The sale appears to have been accomplished in violation of the automatic stay. In order to transfer the aforementioned physical assets to Kroger free and clear of liens, Malone & Hyde filed UCC–3 statements terminating its security interest in all of Megamarket's assets, including bank accounts.

On July 5, 1994, the debtor filed schedules of its assets and liabilities and reported the following bank account balances:

| | | |
|---|---|---:|
| Money Market Savings Account | $ | 100.11 |
| Super One Retail (0952001) | | 313.26 |
| Warehouse Account (0952028) | | 2,681.43 |
| Lottery Account | | 283.16 |
| Payroll Account | | 70.56 |
| Retail Account (0951949) | | 76,601.08 |
| Total | $ | 80,049.49 |

The stipulation of facts filed on June 19, 1995 by the trustee, the debtor, and Fleming provides the following information about the balances in the bank accounts. On June 6, 1994, approximately one month after the commencement of the involuntary bankruptcy proceedings against the debtor, the debtor's insurance carrier, Old Republic Insurance Company, issued a check in the amount of $79,539 to the debtor, which the debtor deposited into its "retail account" on June 10, 1994. The check was a refund of unearned premiums on two workers' compensation insurance policies. According to invoices dated May 24, 1994, the first policy, policy no. 0C–00723405, had an effective date of April 1, 1993 and an expiration date of April 1, 1994. With respect to this policy, Megamarket was owed a refund of an unearned premium or a premium overpayment and a "premium deposit" in the aggregate amount of $24,242. The second policy, policy no. 0C–00723406, had an effective date of April 1, 1994 and an

marks or applications therefor, trade names, rights under license, franchise or other agreements, interests arising from leases, purchase agreements or other contracts covering real or personal property, tax refunds or claims therefor, warranty or guaranty claims, condemnation awards or proceeds, security interests or other security or collateral, all other personal property of any kind or nature and any right, title or interest therein, all books, records, credit files, customer lists, computer programs, printouts, software, manuals, data, materials and records pertaining to any of the foregoing, and all insurance policies insuring any of the foregoing and all proceeds thereof, whether any such assets are now owned or hereafter acquired by Debtor (the "Intangibles").

expiration date of "4/8/94C". Presumably the "C" indicates the policy was canceled as of April 8, 1994, which is the day after Megamarket ceased doing business and only 7 days after the effective date of the policy. Megamarket was owed a refund of the unearned premium on this policy in the amount of $55,297. The parties stipulated they were unable to identify the source of funds in the other bank accounts referenced above.[3]

The debtor contends that Fleming released its security interest in all collateral, including funds on deposit in the debtor's bank accounts, when Fleming filed UCC–3 termination statements on June 29, 1994.

Fleming counters that: (1) it filed the termination statements in error and intended to release its security interest only in the assets sold to Kroger; (2) the validity of its security interest is determined as of the date of the filing of the petition, which was prior to the date of the filing of the UCC–3 termination statements, and as of the petition date Fleming's security interest was perfected; (3) Fleming's security interest in unearned insurance premiums is not governed by Article 9 of the Uniform Commercial Code and would have been perfected under common law even in the absence of a financing statement; and (4) Megamarket waived its right to challenge the validity of Fleming's security interest upon its execution on April 4, 1994 of "Borrower's Consent to Lender's Collection and Application of Accounts Receivables."

Although it has not filed a proof of claim,[4] Fleming asserts it has a claim against Megamarket in the amount of $2,191,189.29, which represents the balance owed by Megamarket as of the date of the involuntary petition less credits for fixtures, inventory and equipment which Fleming sold postpetition. In their stipulation of facts the trustee and the debtor reserved the right to object to the allowance of Fleming's claim or to contest the validity, extent and priority of Fleming's security interest.

On October 27, 1993, the Commonwealth of Kentucky Revenue Cabinet filed a notice of tax lien with the Office of the Fayette County Clerk, thereby providing notice of a lien in favor of the Revenue Cabinet on all interest in property, whether real or personal, tangible or intangible, acquired by Megamarket either prior or subsequent to the filing of the notice. On November 14, 1994, the Revenue Cabinet filed a proof of claim in Megamarket's bankruptcy case in the amount of $72,-887.73 for unpaid withholding, sales and use, corporation income and corporate license taxes and applicable penalties and interest. In their stipulated facts the debtor, the trustee, and Fleming reserved the right to object to the allowance of the claim of the Revenue Cabinet or to contest the validity, extent and priority of any lien securing the Revenue Cabinet's claim. The trustee also reserved the right to distribute assets of the estate in conformity with 11 U.S.C. § 724, which effectively subordinates the claim of the Revenue Cabinet to administrative expenses and certain other priority claims. The Revenue Cabinet has not appeared in connection with the motions now before the court.

The debtor's schedule D listed 49 former employees who may have claims for accrued but unpaid vacation pay in the aggregate amount of approximately $36,852. The debtor stipulated that it is unable to verify when vacation pay accrued for any of its former employees. Fleming asserts that because the debtor cannot demonstrate that the claims of former employees came due within six months prior to bankruptcy, and because their claims are for unpaid vacation pay, not unpaid wages, the claims are not priority lien claims as provided by KRS 376.160.[5] Eight

---

3. The parties neither acknowledged nor offered an explanation for the postpetition reduction in the balance of the retail account by the amount of $2,937.92 ($79,539 deposited on June 10, 1994 reduced to $76,601.08 balance as of July 5, 1994). The trustee made no disbursements from the accounts. Perhaps checks which were written prepetition were presented and paid postpetition.

4. The notice of commencement of the case filed July 12, 1994, directed creditors not to file a proof of claim unless they receive further notice to do so.

5. KRS 376.160 provides in pertinent part:
376.160. Priority of liens—....
Liens of employes for wages coming due to them within six (6) months before the property or effects shall come to be distributed among

of the former employees have filed proofs of claim. None of the former employees has made an appearance respecting the motions now before the court. In their stipulation the debtor, the trustee, and Fleming reserved the right to object to the allowance of claims of former employees or to contest the validity, extent, and priority of any lien securing those claims.

*CONCLUSIONS OF LAW:*

Whether a creditor has a perfected security interest which takes priority over the hypothetical judgment lien of the trustee under title 11 U.S.C. § 544(a) is determined as of the commencement of the bankruptcy case. The trustee's judicial lien, which came into existence and affixed to assets of the debtor upon the intervention of bankruptcy on May 5, 1994, is inferior to the prior perfected security interests of Fleming in property of the bankruptcy estate covered by the security agreements of Fleming.

To decide whether a creditor's security interest continues in property acquired by the debtor after bankruptcy, in this instance, the insurance premium refund deposited in the debtor's retail account, reference is first made to section 552 of the Bankruptcy Code, which provides as follows:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the com-

mencement of the case and *if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds . . . of such property, then such security interest extends to such proceeds . . . acquired by the estate after the commencement of the case* to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552 (emphasis added).[6]

The debtor acquired a right to the refund in the amount of $79,539 before the commencement of this case, but received the actual refund after its bankruptcy case was commenced.[7] The balance on hand in the debtor's retail bank account in which the refund was deposited is not subject to Fleming's security interest unless it constitutes proceeds of Fleming's collateral. 11 U.S.C. § 552(a). "Proceeds" as defined in the Uniform Commercial Code includes "whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds." KRS 355.9–306(1). "Proceeds" as used in section 552(b) "is not limited to the technical definition of that term in the U.C.C., but covers any property into which property subject to the security interest is converted." H.R.Rep. 95–595, 95th Cong., 1st Sess. at 377 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6333.

An unearned premium has been defined by one court as follows:

[A]lthough an insurance policy covering a long period into the future may be paid for

creditors shall be superior to the lien of any mortgage or other encumbrance theretofore or thereafter created....

**6.** The ellipses in the quoted passage replace the words "product, offspring, rents, or profits." Obviously the unearned premium refund is not product, offspring, rents or profits.

**7.** Note that section 552(b) applies only to proceeds acquired by the *estate* after the commencement of the case. Section 541(a)(6) of the Bankruptcy Code provides that proceeds of or from property of the estate also become property of

the estate. "Proceeds" as used in section 541(a)(6) "is not used in a confining sense, as defined in the Uniform Commercial Code, but is intended to be a broad term to encompass all proceeds of property of the estate." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. at 368 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6324. The postpetition refund of a premium Megamarket paid to obtain insurance policies prepetition would seem to be "sufficiently rooted in the pre-bankruptcy past" to justify inclusion as property of the estate. *See Segal v. Rochelle,* 382 U.S. 375, 379–81, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966).

in advance, the insurer earns the premiums only as each "daily unit" of insurance is extended to the insured. Thus, on any given day during the term of an insurance policy, there is a fund of unearned premiums which must be refunded upon cancellation of the coverage.

*Drabkin v. A.I. Credit Corporation*, 800 F.2d 1153, 1155 (D.C.Cir.1986).

Generally accepted accounting principles recognize the insured's right to receive a refund of unearned premiums during the term of an insurance policy. According to GAAP, because a premium for insurance customarily is paid in advance, it is amortized over the term of the insurance policy purchased with the premium. The unearned portion of the premium is considered an asset of the insured, usually denominated on the insured's balance sheet as "prepaid insurance." As time passes, a ratable portion of the premium is periodically charged off as an expense. *See generally* Patrick R. Delaney, James R. Adler, Barry J. Epstein, and Michael F. Foran, *GAAP: Interpretation and Application of Generally Accepted Accounting Principles* at 37, 121 (1993). At the end of each accounting period, the amount expensed is roughly equivalent to the earned portion of the premium as calculated by the insurer. Thus when an insurance policy is canceled before it expires, the unearned premium, which is roughly equivalent to the balance remaining in the "prepaid insurance" balance sheet account, is refunded to the insured. According to GAAP, a prepaid insurance account is a current asset. It is easily convertible to cash upon expiration or cancellation of the policy.

Further analysis is required to determine whether a lender has a properly perfected security interest in the refund, and more importantly in this case, in the "right to receive" the refund. Classification of the collateral under the Uniform Commercial Code is necessary in order to make that determination. By referring to the definitions in Article 9 of the Uniform Commercial Code we can readily determine that a prepaid insurance account is not "goods," "chattel paper," a "document," or an "instrument." We can also eliminate "account," because the

right to a refund of unearned insurance premiums is not a "right to payment for goods sold or leased or for services rendered...." KRS 355.9–106. Although the prepaid insurance account is readily converted to cash upon cancellation of the insurance policy, it is not "money." "Money" means currency; it does not mean the right to receive currency. This is supported by the fact that a security interest in "money" can be perfected only by the secured party's taking possession. KRS 355.9–304. Nor is a prepaid insurance account a "deposit account," which is excluded from the scope of Article 9 of the UCC. "Deposit account" means "a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit." KRS 355.9–105(e).

A prepaid insurance account, i.e., the right to receive a refund of an unearned insurance premium, is a "chose in action" or a "thing in action," which falls under the category of a "general intangible." *In re Gross–Feibel Company, Inc.*, 21 B.R. 648, 649 (Bankr.S.D.Ohio 1982); William D. Hawkland, Richard A. Lord, and Charles C. Lewis, *Uniform Commercial Code Series* § 9–106:03 (1996) (rights to refunds, rebates, or other discounts are general intangibles). *See also In re Foreman*, 1990 WL 250987 (N.D.Ohio 1990); *In re Maplewood Poultry Co.*, 2 B.R. 550, 554 n. 5 (Bankr.Maine 1980). A "general intangible" is defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." KRS 355.9–106. A "general intangible" as defined in section 9–106 of the Uniform Commercial Code is not necessarily commensurate with the GAAP-defined "intangible assets" such as goodwill, patents, trade names, and the like. The former subsumes the latter.

The right to receive a refund of an unearned insurance premium may also be a "contract right" insofar as a rebate of an unearned premium is provided for by the insurance policy. However, the term "contract right" was eliminated as a separate classification of collateral by the 1972 amendments to the Uniform Commercial Code

(adopted in Kentucky as of July 1, 1987). "Contract rights" may be classified as either "accounts" or "general intangibles" as the context requires.

In the case of *In re Gross–Feibel Company, Inc.*, 21 B.R. 648 (Bankr.S.D.Ohio 1982), the Bankruptcy Court for the Southern District of Ohio found that the right to receive a rebate of unearned insurance premiums is a general intangible covered by the secured lender's security interest. 21 B.R. at 649. The refund itself, which the debtor received postpetition, constitutes "proceeds" of the general intangible. *Id.*

In this case, the debtor "acquired" the proceeds, that is the refund, postpetition, but when did the debtor "acquire" the *right* to receive the refund? If the debtor "acquired" the right to receive the refund before the petition was filed, the bank's security interest would continue in proceeds acquired postpetition, and the secured lender would be entitled to receive the amounts refunded. If, however, the right to receive a refund of unearned premiums arose postpetition, then section 552 of the Bankruptcy Code would cut off the bank's security interest in such after-acquired property. The issue was not resolved in *Gross–Feibel.* The court held that the bank failed to carry its burden of proof on the issue of when the debtor acquired not the refund itself, but the right to receive the refund. 21 B.R. at 650.

A different analysis was employed, and a different result was reached, in the case of *In re Duke Roofing Co., Inc.*, 47 B.R. 990 (E.D.Mich.1985). There the United States District Court for the Eastern District of Michigan held that the security interest of a lender in all assets of the debtor, including contract rights and general intangibles, would not defeat the hypothetical judgment lien of the bankruptcy trustee in a postpetition refund of unearned insurance premiums. The court noted that Article 9 of the Uniform Commercial Code does not apply to claims "in or under any policy of insurance." UCC § 9–104(g). Thus, the respective priorities of the secured lender and the bankruptcy trustee in a refund of unearned insurance premiums cannot be determined by reference to the Uniform Commercial Code. *Id.* at 991–

92. The court applied the common law of Michigan. Prior to enactment of the Uniform Commercial Code, a creditor could not hold a perfected security interest in the debtor's after-acquired property and was required to take additional steps to perfect a security interest after the debtor's acquisition of property. *Id.* at 992. The court then turned to the question of when the debtor "acquired" the property. The court held: "[T]he debtor had no property right in any refund of unearned insurance premiums [as of the date of the petition] because the insurance policies had not yet been canceled." 47 B.R. at 993. Thus, the secured lender did not have a perfected security interest in the refund sufficient to defeat the judgment lien of the bankruptcy trustee. *Id.* at 993.

Section 9–104(g), KRS 355.9–104(7), provides:

> This Article [Article 9 of the Uniform Commercial Code] does not apply:
>
> . . . .
>
> (7) To a transfer of an interest in or claim in or under any policy of insurance, except as provided with respect to proceeds (KRS 355.9–306) and priorities in proceeds (KRS 355.9–312). . . .

One treatise on the Uniform Commercial Code discusses the applicability of section 9–104(g) to insurance premium refunds:

> One question that has arisen is the extent to which the exclusion should apply to insurance premium refunds when a secured party makes a claim to them as a general intangible. When the debtor overpays his premium, cancels his insurance, or otherwise becomes entitled to a refund and several creditors lay claim to it, the question of whether it is included under Article 9 as an intangible or excluded because it is a "claim in or under" an insurance policy may become important. The majority view treats the refund as excluded from Article 9, at least when the secured party making claim to it has not financed the premium payment. Aside from the very broad language of exclusion in subsection 9–104(g) justifying the result, both the noncommercial, windfall nature of the refund and the fact that the secured party

making the claim is probably doing so to the detriment of other general creditors (often in a bankruptcy proceeding) support the result from a policy standpoint.

William D. Hawkland, Richard A. Lord, and Charles C. Lewis, *Uniform Commercial Code Series* § 9–104:08 (1996) (citing *In re Universal Motor Express, Inc.*, 72 B.R. 208 (Bankr.W.D.N.C.1987); *In re RBS Industries, Inc.*, 67 B.R. 946 (Bankr.Conn.1986); *In re U.S. Repeating Arms Co.*, 67 B.R. 990 (Bankr.Conn.1986); *In re Duke Roofing Co. Inc.*, 47 B.R. 990 (E.D.Mich.1985)).

With the exception of the case of *Duke Roofing*, discussed above, the cases cited in the Hawkland treatise involve premium finance arrangements. A premium finance company advances the full amount of an insurance premium to the insurer or its agent on behalf of the insured. The insured then repays the premium finance lender the amount of the premium plus interest in installments. By executing the premium finance agreement, the debtor generally gives to the lender a security interest in all unearned premiums and dividends, and also grants the lender a power of attorney to cancel the policies and receive the unearned premium in the event of the debtor's default in making payments to the lender. In these cases, the courts have found that a UCC–1 filing is not necessary to perfect the security interest of the premium finance lender because the transaction is excluded from the scope of Article 9 of the Uniform Commercial Code by section 9–104(g). This makes sense because filing a financing statement to put interested parties on notice of the premium finance lender's security interest would not be as effective as notifying the insurer, which is what the premium finance lender does upon execution by the debtor of the premium finance agreement and accompanying power of attorney.

The court is not persuaded that section 9–104(g) of the Uniform Commercial Code, KRS 355.9–104(7), is applicable to the situation presented in this case. As of the date of the commencement of the case, Fleming had a properly perfected security interest in the debtor's general intangibles. The right to receive a refund of an unearned insurance premium is a general intangible. Even if that right is considered to be inchoate until the insurance policy expires or is canceled, the policies here expired or were canceled prior to bankruptcy. The collateral, the right to receive the refund, is "property of the debtor acquired before the commencement of the case." 11 U.S.C. § 552(b). The refund itself constitutes proceeds of the collateral. Fleming's security interest in property which the debtor acquired before the commencement of the case and proceeds thereof extends to proceeds acquired by the debtor after bankruptcy.

The inadvertent release of Fleming's security interests in the proceeds of its collateral, specifically the debtor's bank accounts, subsequent to bankruptcy and prior to the trustee's notice of abandonment, perhaps elevated the trustee's judicial lien to a first lien position on the bank accounts during that interim period. However, to permit the bankruptcy estate and the general creditors to reap benefit from the creditor's unintended postpetition release of its security interest in this collateral would be inequitable.[8]

The trustee's motion to abandon this property shall be sustained. The debtor's objection to the trustee's notice of abandonment shall be overruled. Fleming's motion to require the trustee to turn over to it the funds in the debtor's bank accounts shall be sustained.

---

**8.** For example, the failure of a creditor to file a continuation statement when a financing statement expires during the pendency of a bankrupt-cy case does not improve the trustee's position as a judicial lien holder. *In re Chaseley's Foods, Inc.*, 726 F.2d 303 (7th Cir.1983).