**In re E–Z SERVE CONVENIENCE STORES, INC., et al., Debtors.**

No. 02–83138–11D.

United States Bankruptcy Court,
M.D. North Carolina,
Durham Division.

Sept. 16, 2003.

E–Z Serve Convenience Stores, Inc., Pro Se.

John A. Northen, Chapel Hill, NC, Richard M. Hutson, II, Durham, NC, Terri Gardner, Raleigh, NC, Martin T. Fletcher, Brent C. Strickland, Dennis J. Shaffer, Baltimore, MD, for Trustee.

## MEMORANDUM OPINION

CATHARINE R. CARRUTHERS, Bankruptcy Judge.

This matter came on before the court to consider the Motion by Special Counsel for the Debtors to Transfer Advance Payments to the Trustee. Kenneth M. Greene and Jeffrey Oakes appeared on behalf of CIT Group/Business Credit Inc. ("CIT Group"), John A. Northen appeared on behalf of the Chapter 11 Trustee, Lisa P. Sumner appeared on behalf of the Unsecured Creditors Committee (the "Committee"), Christine L. Myatt appeared on behalf of GE Capital Franchise Finance Corporation ("GE Capital") and Robyn Whitman appeared on behalf of the Bankruptcy Administrator. After receiving the exhibits, the pleadings and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

## BACKGROUND FACTS

E–Z Serve Convenience Stores, Inc., E–Z Serve Corporation, SSCH Holding Corp., Swifty Serve, LLC, and Swifty Serve Holding Corp. (collectively the "Debtors"), commenced their respective reorganization cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 4, 2002 (the "Petition Date"). This Court ordered that the cases be administered jointly on October 7, 2002.

Prior to the bankruptcy filing, the Debtors and CIT Group had entered into a Financing Agreement dated September 23, 1999 with several subsequent amendments (collectively referred to as the "Financing Agreement") pursuant to which CIT Group made loans and extended credit to the Debtors. CIT Group was secured by first priority perfected liens and security interests in certain assets and properties of the Debtors. Specifically, the Financing Agreement provided that as security for payment of any loans or advances made to the Debtors, CIT Group would maintain a security interest in all of the Debtor's "(a) present and hereafter acquired Inventory; (b) present and future accounts; (c) present and future Documents of Title; (d) present and future General Intangibles; (e) present and future Subsidiary Collateral; and (f) present and future Other Collateral."

In preparation for the bankruptcy filing, the Debtors retained the law firms of Rayburn, Cooper and Durham, P.A. ("RC & D") and Morris, Nichols, Arsht & Tunnell ("Morris Nichols") to serve as co-counsel in the Chapter 11 proceedings. The Debtors provided Morris Nichols with advance payments totaling approximately $790,000.00 (the "Retainer") for services to

be rendered prior to and during the bankruptcy cases. Of that amount, the Debtors paid $384,062.00 to Morris Nichols for services rendered prepetition in contemplation of, or in connection with these cases.

At the time of the bankruptcy filing, the Debtors were indebted to CIT Group in the amount of approximately $17 million, with an additional exposure of approximately $4.1 million arising from outstanding stand-by letters of credit. The Debtors had ceased all operations, was unable to fund its last payroll, and had no ability to secure its stores from vandalism or theft. On October 10, 2002, an order was entered lifting the automatic stay as to CIT Group and all of its collateral as set forth in the Financing Agreement, except for outstanding accounts of the Debtors. Just two weeks after filing, on October 18, 2002, an order was entered appointing a Chapter 11 Trustee. Subsequent to the appointment of the Trustee, Morris Nichols remitted a total of $120,000.00 to the Trustee for partial payment of the Trustee's bond and other administrative costs of the estate.[1]

Several months after the Petition Date, the Trustee informed Morris Nichols that its services were no longer necessary in these cases, and on February 28, 2003, Morris Nichols filed a motion for authority to withdraw as counsel for the Debtors and to transfer the remaining portion of the Retainer held by counsel for the Debtors to the Trustee, free and clear of any prepetition or postpetition liens. In addition, on February 28, 2003, Morris Nichols submitted its First and Final Application for Compensation and Reimbursement of Expenses as Co–Counsel for the Debtors for the Period of October 4, 2002 through

---

1. CIT Group did not object to the use of the retainer funds for these administrative expenses.

January 31, 2003. In its Application, Morris Nichols requested payment of $69,635.00 in fees and reimbursement of $3,146.31 in expenses incurred postpetition in connection with the case. Morris Nichols has further applied for payment of previously unbilled and uncaptured prepetition fees in the amount of $142,754.06 and expenses in the amount of $4,159.56.[2] After payment of the allowed fees and expenses, Morris Nichols holds a remaining retainer balance in the amount of $186,546.96.

In response to Morris Nichols' motion to withdraw and transfer funds, CIT Group filed a limited objection claiming that pursuant to the Financing Agreement and filed financing statements, it has a secured and perfected security interest in the Debtors' right to the unearned portion of the Retainer. CIT Group's objection is based upon the premise that the Debtors' right to the remaining balance of the Retainer is a general intangible that was created at the time the Debtors paid the Retainer to Morris Nichols.[3]

The Trustee contends that CIT Group does not have a perfected security interest in the remaining portion of the Retainer. The Trustee has filed several briefs in which he has argued alternatively that (1) the Debtors' right to a partial refund of the Retainer constitutes a general intangible asset acquired by the estate after the commencement of the case and is not subject to any lien resulting from a security agreement entered into by the Debtors before the commencement of the case by virtue of 11 U.S.C. § 552(a); (2) the asset is "money" pursuant to the UCC, and CIT Group did not have a perfected security

interest in the money held in the Morris Nichols retainer account on the Petition Date; or (3) the asset is a "deposit account" of the Debtor that is controlled by Morris Nichols and CIT Group did not have a perfected security interest in that deposit account on the Petition Date.

In contrast, the Unsecured Creditors' Committee argues that on the date of the petition, the Debtors had no interest in that Retainer because it became the property of Morris Nichols upon payment. Therefore, the refund from the Retainer was acquired by the estate after the commencement of the case and, as such, is not subject to any lien by operation of 11 U.S.C. § 552(a). Finally, the Bankruptcy Administrator argues that the Retainer and any unused portion thereof is "money" that became property of the estate upon the filing of the bankruptcy petition, and in which CIT Group did not have a perfected security interest because it did not have possession.

## DISCUSSION

The issue before the court is whether CIT Group is entitled to payment of the unused and unearned portion of the Retainer held by Morris Nichols pursuant to a prepetition security interest. The answer to this question depends upon (1) whether the Debtors' interest in the unused portion of the Retainer is a general intangible as defined by the Uniform Commercial Code, and (2) whether the Debtors' interest in the unearned portion of the Retainer existed prepetition.

■ A bankruptcy retainer is a sum of money paid by a client to an attorney for

---

2. The court has made a finding as to the amount of additional prepetition fees and expenses to which Morris Nichols is entitled in a separate order.

3. Morris Nichols' motion to withdraw was granted on April 15, 2003, leaving only the motion to transfer funds to the Trustee free and clear of liens for further consideration by the court.

work to be performed in the future. The types of retainer agreements allowed vary from state to state. Courts generally recognize three types of retainers including (1) a classic retainer paid to secure an attorney's availability to represent the client, whether or not services are ever performed; (2) an advance payment retainer paid for all future services to be performed, amounting to a flat fee; and (3) a security retainer paid by the client and held in the attorney's trust account as security for payment of future fees. *In re Equipment Services, Inc.*, 290 F.3d 739, 746–47 (4th Cir.2002).

■■■ The rights of the parties to a retainer agreement are controlled by state contract law, subject to state bar ethical rule and regulations. *Id.* Whether a client retains a property interest in the retainer funds is a question of contract law and is dependant upon the terms of the retainer agreement. *Id.* In North Carolina, most retainer agreements provide for a "security retainer" which is paid to secure payment of fees for future services that the attorney is expected to render, though the North Carolina State Bar regulations appear to allow for a classic retainer or advance payment in some limited instances. If a retainer agreement provides for a security retainer, then the client retains a property interest in the retainer funds. *In re Equipment Services, Inc.*, 290 F.3d at 746.

■■■ In this instance, the retainer agreement between the Debtors and Morris Nichols includes the characteristics of a "security retainer." The retainer agreement provides:

> To ensure the prompt payment of our fees and charges, we require ... an advance fee for services to be rendered and expenses to be incurred in connection with our representation. In addition, we will require other advance payments from time to time in amounts we determine necessary and in order to maintain an advance payment balance in excess of accrued fees and expenses.... We will return to the Company any portion of our advance fee that is not earned upon the conclusion of our engagement.

Despite the use of the term "advance fee," the Morris Nichols retainer agreement has the characteristics of a security retainer. First, the Debtors' funds were deposited in a trust account controlled by Morris Nichols rather than the law firm's general operating account. In addition, the retainer agreement provides that either party may terminate the relationship upon written notice and that upon termination, the portion of the retainer funds not earned must be returned to the Debtors. Finally, the language of the retainer agreement reflects the intent of the parties that the fee would not be earned upon receipt by Morris Nichols, but that Morris Nichols would look to the retainer for payment of monthly invoices. Therefore, the funds received by Morris Nichols constitute a security retainer, in which the Debtors maintained an interest.

■■■ Nevertheless, while it is clear that the Debtors retained an interest in the retainer funds, there are few, if any, reported cases that address exactly what the nature of the Debtors' interest is vis-a-vis a secured creditor of the Debtors. Clearly, it is unusual in a bankruptcy case for retainer funds not to be exhausted in full. To determine whether CIT Group has a properly perfected security interest in the Debtors' right to the retainer refund, the court must classify this interest under the Uniform Commercial Code. To do so, the court must examine the primary use of this collateral from the perspective of the Debtors. The numerous briefs by the parties have presented three possible clas-

sifications of the Debtors' interest in the Retainer to the court: money, a deposit account or a general intangible. The court concludes that, in as much as the Debtor's interest in the Retainer can neither be properly identified as money or a deposit account, this interest is a general intangible.

■ Both the Bankruptcy Administrator and the Trustee have asserted that the funds in the Retainer account should be classified as "money" for the purposes of evaluating the secured interest of the Debtors' creditors. They contend that Morris Nichols placed the Debtors' money into its trust account for the purpose of perfecting its possessory security interest pursuant to N.C. Gen.Stat. § 25–9–305. Pursuant to the Uniform Commercial Code, " 'money' means a medium of exchange authorized or adopted by a domestic or foreign government and includes a monetary unit of account established by an intergovernmental organization or by an agreement between two or more nations." N.C. Gen.Stat. § 25–1–201(24). The definition of "money" under N.C. Gen.Stat. § 25–1–201(24) is limited to cash or legal tender, not the right to receive currency. *Christison v. U.S.,* 960 F.2d 613, 616 (7th Cir.1992); *In re Megamarket of Lexington, Inc.,* 207 B.R. 527, 533 (Bankr.E.D.Ky. 1997). Furthermore, the court must look at the use of the collateral in the hands of the Debtors. The funds located in the Morris Nichols trust account are not the Debtors' "money." The Debtors have only the right to receive a refund on the unearned portion of the retainer fund.

■ The Trustee contends that the Debtors' interest in the funds is the ownership interest of a "deposit account." " 'Deposit account' means a demand, time, savings, passbook, or similar account maintained with a bank. The term does not include investment property or accounts

evidenced by an instrument." N.C. Gen. Stat. § 25–9–109(a)(29). The Debtors' interest in the unearned portion of the Retainer is not a deposit account for several reasons. A deposit account is maintained by a bank or similar institution. *See In re Richman,* 181 B.R. 260, 264 (Bankr.D.Md. 1995). The funds that the Debtors paid to Morris Nichols are held in a trust account, but Morris Nichols is not a bank. The trust account may be a deposit account of Morris Nichols, but it is not the Debtors' deposit account. The Debtors certainly have no ownership interest in any other funds held in the trust account. The Debtors only have an interest in the unearned portion of the Retainer fund, which is simply documented as a book entry by Morris Nichols and added to other unsegregated funds in a trust account.

Both CIT Group and the Committee contend that the Debtors' interest in the Retainer is a general intangible. Pursuant to the Uniform Commercial Code, general intangible "means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." N.C. Gen.Stat. § 25–9–102(a)(42). Thus a general intangible is defined through a process of elimination, and is personal property that does not come within any other definition.

Numerous courts have found that a right to a refund similar to that at issue in this case is a general intangible. *See e.g., Christison v. U.S.,* 960 F.2d at 616–17 (debtor's property right to receive a net lump sum each month, from unsegregated funds, would be considered a "general intangible" under U.C.C. Article 9–106 rath-

er than "money"); *In re Vienna Park Properties,* 136 B.R. 43 (S.D.N.Y.1992) (funds held in escrow agreement entered by Chapter 11 debtor, as purchaser of apartment complex vendor, were a "general intangible"); *In re Iroquois Energy Management, LLC,* 284 B.R. 28 (Bankr. W.D.N.Y.2002) (debtor's right to a refund in connection with its overpayment for natural gas is in the nature of "general intangible"); *In re Megamarket of Lexington, Inc.,* 207 B.R. at 533 (the right to receive a refund of an unearned insurance premium is a "chose in action" which falls under the category of a "general intangible").

■ A general intangible represents the prospect of a recovery of an asset that is tangible. *In re Iroquois Energy Management, LLC,* 284 B.R. at 32. "To its own secured creditors, the owner of an intangible asset provides the one certain link between the secured claim and the payment of cash. From a transaction secured by intangibles, the source of cash is a step removed." *Id.* Because the Debtors' interest is neither a deposit account or money, and is merely a right to receive funds, the court finds that this interest is a general intangible.

■ While the Committee agrees with CIT Group's conclusion that the nature of the Debtors' interest in the Retainer is that of a general intangible, the Committee argues that the Debtors had absolutely no interest in the Retainer prepetition. Therefore, the Committee urges the court to find that any security interest of CIT Group was cut off by 11 U.S.C. § 552(a). Section 552(a) provides that property acquired by the estate or debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case. 11 U.S.C. § 552(a).

The Committee's position is simply not supported by the prevailing case law. The majority of courts clearly hold that a debtor has an equitable interest in a retainer at the time that a bankruptcy petition is filed. Consequently, that equitable interest becomes property of the estate upon the bankruptcy filing pursuant to 11 U.S.C. § 541. *See In re Mahendra,* 131 F.3d 750, 756 (8th Cir.1997) ("The debtor's equitable interest in the unearned portion of the retainer becomes property of the estate upon the filing of the bankruptcy petition."); *Indian Motocycle Associates III Ltd. Partnership v. Massachusetts Housing Finance Agency,* 66 F.3d 1246, 1255 (1st Cir.1995) ("the debtor's equitable 'interest' in any unearned portion of the retainer, impressed with [the law firms's] perfected lien, would have become property of the estate on the date the chapter 11 petition was filed"); *In re Mondie Forge Co.,* 154 B.R. 232, 238 (Bankr.N.D.Ohio 1993) (if debtor has legal or equitable interest in unearned retainer under applicable state law, then unearned retainer becomes estate property); *In re Lilliston,* 127 B.R. 119 (Bankr.D.Md.1991) (unearned portion of fee retainer is property of the estate because the debtor retains an equitable interest in it).

The court finds that section 552 is not applicable in this case because the Debtors' interest in the retainer funds was created by the contractual retainer agreement with Morris Nichols. The Debtors' rights in the retainer arose prepetition, and therefore, became property of the estate upon the bankruptcy filing pursuant to 11 U.S.C. § 541. Section 552 cannot be used to strip off a lien on property that existed prepetition. CIT Group properly perfected its security interest by filing the appropriate financing statements. Accordingly, the Debtor's right to the refund of the Retainer Balance, a general intangible, is subject to CIT Group's security interest.

For the reasons stated herein, the court finds that CIT Group has a valid, prepetition first-priority interest in the Debtors' equitable interest in the Retainer fund and it is entitled to any unearned and unused portion of the Retainer. The court is not making any finding as to CIT Group's lien on funds that have already been remitted to and expended by the Trustee. This ruling is limited to the unearned and unused portion of the funds in the Morris Nichols Retainer in the amount of $186,546.96.

An Order will be entered consistent with this Memorandum Opinion. The court further finds that Trustee has 45 days from the entry of the Order within which to file an application pursuant to 11 U.S.C. § 506(c) for the reasonable costs and expenses of preserving CIT Groups's collateral to the extent of any benefit to CIT Group. In the event that the Trustee does not file a 506(c) application, the remaining funds should be remitted to CIT Group. In the event that the Trustee files an application for 506(c) fees, CIT Group is entitled to the funds remaining after payment of any 506(c) fees allowed.

### ORDER

Pursuant to the Memorandum Opinion filed contemporaneously herewith, the Motion by Special Counsel for the Debtors to Transfer Advance Payments to the Trustee free and clear of any pre-petition or post-petition liens is DENIED.