Filed 9/14/21  Chaves v. Modesto Livestock Com. Co. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DAVID CHAVES,<br><br>    Cross-complainant and Respondent,<br><br>    v.<br><br>MODESTO LIVESTOCK COMMISSION COMPANY, INC.,<br><br>    Cross-defendant and Appellant. | F080130<br><br>(Super. Ct. No. 2024694)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  John D. Freeland, Judge.

Mayol & Barringer and Bart Barringer, for Cross-defendant and Appellant.

Law Office of Curtis D. Colaw and Curtis D. Colaw, for Cross-complainant and Respondent.

-ooOoo-

This matter stems from the January 22, 2016 sale of 400 dairy cattle by cross-complainant and respondent, David Chaves, to one Sean Hodges, pursuant to a commercial sales agreement, a purchase money secured promissory note, and a purchase money security interest agreement. The agreements and promissory note were executed on January 22, 2016, the date of sale. The cattle were sold for $740,000, which was the amount reflected in the agreements and promissory note. Chaves perfected his security interest in the cattle sold to Hodges by filing a Uniform Commercial Code (UCC) Financing Statement with the California Secretary of State on the date of sale.

Hodges, a third-party debtor for purposes of this matter, defaulted on the secured promissory note in January 2017. Modesto Livestock Commission Company, Inc. (MLCC or Modesto Livestock), cross-defendant and appellant, is a "Modesto, California based livestock auction," that "acted as a sales broker" in purchasing and selling cattle for Hodges, after Hodges's purchase of Chaves's cattle. Here, Chaves brought a conversion action in tort against MLCC to enforce the purchase money security interest in the cattle—and any proceeds arising from the cattle—that Chaves had sold to Hodges.

As mentioned, Hodges would buy and sell cattle through MLCC. He had an "open account," essentially an unsecured credit account, with the company. MLCC kept track of the account balances by means of a ledger. On January 5, 2017, Hodges's account with MLCC had an outstanding balance of $18,957.40 related to cattle purchases made by Hodges.

Thereafter, between January 12, 2017 and February 20, 2017, MLCC sold 49 cattle for Hodges. Although Chaves had a lien against the proceeds of cattle sold by Hodges, MLCC retained $18,957.40 in proceeds from the sale of Hodges's cattle to zero out the outstanding balance in that amount owed on Hodges's account with MLCC. Chaves sought to reclaim the cattle sale proceeds retained by MLCC on grounds he had a prior secured interest in them.

The matter was tried before the superior court in a two-day bench trial. Four witnesses testified: Chaves, Emanuel Borges Silva, Jr.,[1] Lary Gremp of MLCC,[2] and Sean Hodges. Following the trial, the superior court found that "the 49 cows sold at MLCC were subject to Chaves'[s] Purchase Money Security Agreement for Dairy Livestock with Hodges," and that "Chaves'[s] security interest is superior to the claimed security interest of MLCC." (Unnecessary capitalization omitted.) The court consequently determined that "judgment is to be entered in favor of Chaves and against MLCC in the sum of $18,95[7].40." (Unnecessary capitalization omitted.) We affirm.

## FACTS AND PROCEDURAL BACKGROUND

This appeal arises from a cross-complaint filed by Chaves regarding a sub-dispute between Chaves and MLCC, in the context of a larger lawsuit involving the California Department of Food and Agriculture (CDFA) and multiple other parties. The parties to the present appeal have not addressed or explained the larger context of the instant matter, and the details of the broader lawsuit are not fully reflected in the limited record on appeal provided here. Accordingly, we will not further address the larger lawsuit connected to the instant matter.

The instant dispute arose from Chaves's sale of 400 dairy cattle to Hodges on January 22, 2016, pursuant to a sales agreement, a purchase money secured promissory note, and a purchase money security agreement, all executed on the same date (i.e., January 22, 2016).[3] The sales price for the cattle was $740,000, extended as a secured loan from Chaves to Hodges, and the purchase money secured promissory note specified that Hodges would pay Chaves $22,955.55 monthly, starting on March 5, 2016. Chaves

---

[1]    Silva was a friend of Chaves's and veteran of the dairy industry.

[2]    Gremp's position with MLCC is not reflected in the record.

[3]    The cattle were bought by Hodges, Hodges's wife (Heidi Hodges), and Hodges's mother (Lisa Goulart); all three were cosignatories on documents related to the sale. However, for purposes of the instant matter, Hodges is the relevant third-party debtor.

filed a UCC financing statement with the California Secretary of State on January 22, 2016, to perfect his security interest as described in the purchase money security interest agreement. All the relevant documents were admitted into evidence at trial as exhibits.

Chaves received, through January 2017, the monthly payments due on the promissory note, and thereafter the payments stopped. Chaves received the payments through a milk assignment from the National Farmers Organization that bought the milk Hodges obtained from the cattle purchased from Chaves. After Chaves received the last payment, he was still owed approximately $530,000, towards which amount he eventually obtained $29,000 through various efforts. The outstanding balance remained unpaid.

The purchase money security agreement executed by Chaves and Hodges provided that the cattle subject to the agreement would be kept at a specified location in Livingston, in a clean environment, with adequate food, water, and veterinary care. However, the cattle were moved to a new location in Hilmar about six or seven months after Hodges purchased them. Chaves drove by the new location a few times and "observed a muddy mess." He testified: "[A] lot of cows that were there appeared not to be mine." By the time the payments to Chaves ceased in January 2017, Hodges had cows at two locations, one in Hilmar and the other in Turlock. At that time, Chaves conducted additional inspections at both facilities; he conducted approximately four or five such inspections.

The cattle sold by Chaves to Hodges were branded with a diamond C pattern (Chaves's brand). However, Chaves saw that Hodges had commingled cattle of various brands together at the Hilmar and Turlock facilities. More specifically, the number of cattle branded with the diamond C appeared to have declined in numbers relative to their numbers at the time of sale and were commingled with other cattle. Chaves was assisted by a friend and veteran of the dairy industry, Emanuel Borges Silva, Jr., who testified most of the cattle on Hodges's lots were unbranded. Cattle are generally traced either by

4.

means of brands, or, if they are unbranded, by means of ear tags (numbers tattooed in the ear).

In addition, Chaves testified there was no feed on the lots and the cows were in a bad state, appearing as "a bunch of skinny cows." Chaves testified: "[Hodges] didn't have any feed. He couldn't feed – no longer could feed the cows." Chaves added: "And the cows were so diseased[,] and the bacteria count was so high[,] that National Farmers Organization stopped taking [Hodges's] milk." Chaves explained that this was the reason Chaves did not get any more assignment payments. At the same time, Chaves became aware that Hodges was selling off and liquidating the cattle.

Silva similarly testified that in January 2017, the cattle on Hodges's lots were in "horrible shape," "poorly maintained," and with "very little feed." It was clear from the situation in the milk barn that milk production was no longer viable on account potentially of "bacteria counts in the line." There were "[a]bout 300 head" of cattle in one facility (Hilmar) and about 100 head of cattle in another facility (Turlock); all the cattle were in the same "poor, poor shape." When Chaves sold the cows to Hodges in January 2016, the cows had been in "[e]xcellent condition" and produced milk of high quality and in good quantities.

At this point, the CDFA got involved to preserve the cattle and proceeds from the sale thereof, for all legitimate claimants; the CDFA issued a hold order with respect to the cattle and cattle proceeds. Chaves explained the way the state's hold order worked: "I believe that the state puts a hold, and [the seller] cannot sell the cows. They have to go – they have to stay on the place. Or if they go – if they go to the sales yard … [then the sale proceeds go] into the state fund." Various entities and persons, including Chaves, had filed liens with the California Secretary of State as to the cattle on Hodges's lots and related cattle proceeds. Chaves's lien was second in order. As a result of the state's hold order, distribution of the cattle and cattle proceeds was delayed pending further determination of the rights and interests therein.

5.

Chaves initiated the instant action by filing a cross-complaint against various cross-defendants (including roe cross-defendants) as part of the larger lawsuit referenced above. Chaves's cross-complaint, filed on July 17, 2017, included a cause of action for conversion. MLCC was identified and added as a specific cross-defendant (in place of a roe cross-defendant), with respect to the conversion cause of action, on November 2, 2017. Chaves's cross-complaint pertained to the cattle and cattle proceeds subject to CDFA's hold order. Chaves had reached settlements with some cross-defendants who had competing claims on Hodges's cattle, while yet other cross-defendants had defaulted.[4] Chaves settled with Martella Livestock Market, Inc., which had the first priority claim on the cattle and cattle proceeds, for $36,000, and with Henry Tosta, who also had a claim on the cattle and cattle proceeds, for $20,000. Chaves's $18,957.40 conversion claim against MLCC did not resolve through settlement or default but rather proceeded to bench trial. Chaves's counsel explained at trial that Chaves and the parties with whom Chaves had reached settlements would receive distributions of the cattle and/or cattle proceeds held by CDFA once the trial court issued a judgment in the present case (i.e., on Chaves's cross-complaint).

Chaves and Silva were able to secure over 300 cows from Hodges's Hilmar facility. Eventually 337 of Hodges's cows were sold under CDFA's hold order because they were in "poor shape" or diseased. All proceeds—a total of $116,260—were held by CDFA. For its efforts, CDFA charged a statutory estray fee of $8,425, leaving $107,835.81 for distribution pursuant to the trial court's order in the instant matter. CDFA also released an additional 89 cows to Chaves, for him to hold on behalf of the state until judgment was issued in the present matter. These cows were being looked after and were in fair condition at this point; when Chaves picked them up, they were

---

**4** Sean Hodges was named as a cross-defendant in Chaves's cross-complaint and had evidently reached a settlement with Chaves (any settlement between Hodges and Chaves is not reflected in the record).

"skinny" and "would probably [have gone] for dog food." About 80 of the 89 cows remained in Chaves's possession; the others had either passed away or had to be liquidated, with the proceeds going to CDFA. The remaining 80 cows were presently valued at $600 or $800 apiece.

In the meantime, some of the cows from Hodges's Turlock facility were sent by Hodges to MLCC to be sold. Previously, Hodges had been purchasing cattle through MLCC but, in January 2017, MLCC had cut Hodges off from purchasing cattle because of the accrued balance owed on his open account or credit account with MLCC. Lary Gremp of MLCC testified he told Hodges that, "If [Hodges] didn't pay, [MLCC] would go out and pick up [its] cows." Gremp was asked whether, beginning in January 2016, MLCC obtained a security agreement to secure the cattle purchased by, and released to, Hodges. Gremp responded: "We always had a security agreement. It's [printed] on the bottom of our invoice. Until the cattle are paid in full, Modesto Livestock retains title." Gremp acknowledged, however, that whenever Hodges purchased cattle through MLCC, he immediately took possession thereof, despite owing the purchase price. Gremp also acknowledged that MLCC never filed a UCC financing statement with the California Secretary of State. Gremp testified that after MLCC cut Hodges off from purchasing cattle, Hodges started bringing in cattle to sell, in order to defray the outstanding balance in his account. Gremp testified that the cattle Hodges would sell "were Hodges's cattle."

The parties stipulated that "[o]n January 5, 2017, Sean Hodges owed the sum of $18,957.40 to Modesto Livestock for [previously purchased] cattle[,] as evidenced by Sean Hodges['s] account ledger [maintained by Modesto Livestock]." (Unnecessary capitalization omitted.) The parties further stipulated that "[b]etween January 12, 2017 and February 20, 20[17], Modesto Livestock sold or other[wise] collected proceeds from 49 cattle of Sean Hodges which paid for cattle previously taken by Sean Hodges [through Modesto Livestock]." (Unnecessary capitalization omitted.) Next, the parties stipulated that as a result of the proceeds obtained by Modesto Livestock from the sale of the "49

cattle of Sean Hodges," between January 12, 2017 and February 20, 2017, the outstanding account balance reflected in MLCC's ledger records for Hodges's open account or credit account was reduced, as of February 20, 2017, to $0.00. Finally, the parties stipulated that "Modesto Livestock did not file a UCC Financing Statement with the California Secretary of State's Office." (Unnecessary capitalization omitted.)

MLCC called Sean Hodges as a witness. Hodges's testimony was confusing and difficult to follow. Hodges acknowledged that he had sold off some of Chaves's cows and replaced them with other cows, whereby there was a commingling of cows. When Hodges ceased his dairy operation in early 2017, he had 350 cows at one facility and 103 cows at another facility, for a total of 453 cattle. Chaves picked up 350 of those cows.

Chaves's counsel asked Hodges about cows the latter sold through MLCC in January and February 2017. Hodges responded that the sales had "nothing to do with Chaves's cattle," rather "these were [Hodges's] own cattle," as Hodges had not yet purchased any cattle from Chaves. Chaves's counsel pointed out that Hodges purchased cattle from Chaves in January 2016, well before the cattle sales Hodges made through MLCC in January and February 2017, that were the subject of Chaves's instant cross-complaint against MLCC. Hodges then changed tack; he denied that proceeds from the sale of cattle through MLCC in January and February 2017 were used to pay off any outstanding balance he owed to MLCC. Hodges insisted he always paid for cattle purchased from MLCC on the actual day of purchase (this testimony was contradicted by the testimony of Lary Gremp of MLCC). With regard to the cattle he sold through MLCC in January and February 2017, Hodges also threw in: "And some of these cows weren't even part of the Chaves deal. Some of these cows were Henry Tosta's." Chaves's counsel pointed out that the account ledger maintained by MLCC for Hodges's cattle purchases and sales showed a zero balance on February 20, 2017 (as compared to the $18,957.40 balance owed on January 5, 2017), thereby suggesting that the cattle at issue were Hodges's own cattle as the proceeds accrued to him. Counsel's point also

8.

undercut Hodges's testimony that he always paid for cattle purchased on the day of purchase.

Hodges acknowledged that his wife and business partner, Heidi Hodges, continued to sell cows through MLCC after the sale of the 49 cows sold between January 12, 2017 and February 20, 2017 that were relevant to Chaves's cross-complaint; Heidi Hodges sold cows through MLCC on February 21, 2017 and February 28, 2017. As for the latter cows, i.e., cows sold after February 20, 2017, Hodges also testified: "But these were the Tosta cows. These had nothing to do with the Chaves – Chaves deal at all." Hodges acknowledged, however, that his business received the proceeds from selling these cows. Hodges further acknowledged that on March 1, 2017 or March 2, 2017, he requested MLCC to liquidate an additional 103 cows; MLCC went out to Hodges's facility and took the cows away in trailers. As to these cows, Hodges also testified: "[Those] were owned by Henry Tosta. They had nothing to do with [the Chaves] deal." Ultimately, CDFA stopped this sale of 103 cows; the sale subsequently went forward under CDFA's hold order.[5] Chaves's counsel showed Hodges the state's hold order, which evidently indicated that 75 cows subject to the hold order had Chaves's brand on them and 56 cows had Tosta's brand.[6]

Hodges testified that the cattle he obtained from Henry Tosta were leased cattle. Hodges said there was no written lease agreement; rather it was an oral agreement. Chaves's counsel showed Hodges a written agreement between Hodges and Tosta, signed by both parties; it was an agreement regarding a lease with an option to buy and was admitted into evidence. (See Chaves's Ex. 8.) Hodges denied that the signature on the document was his. Hodges acknowledged that he picked up 400 cattle from Tosta on October 10, 2016, which was also the date listed at the top of the agreement. As to the

---

[5] MLCC's Lary Gremp testified to this effect.

[6] CFDA's hold order does not appear to be included in the record on appeal.

fate of these cows, Hodges testified: "Cows were sold … [¶] … They went to different auctions. I had feed bills to pay." Hodges received payment for the cattle that were sold, in the form of checks.

Towards the end of his testimony, Hodges again addressed the 49 cattle he sold through MLCC between January 12, 2017 and February 20, 2017. While he previously testified that "some" of these cattle belonged to Henry Tosta, at the end of his testimony he said all these cattle belonged to Tosta. However, none of the sales invoices for the relevant transactions referred to Tosta. Hodges further acknowledged that the sales documentation for the cows sold in the relevant time period showed that the cows were unbranded; they did not have Tosta's brand on them. Hodges also acknowledged that he was aware, at the times of these sales, that Chaves had a blanket security interest in cows owned by Hodges, yet Hodges took no affirmative steps to prove that the cows he was selling belonged to Tosta. Rather, Hodges claimed at trial that not every cow that belonged to Tosta had Tosta's brand on it. Hodges noted the cows had ear tags, and said he believed the ear tags on the 49 cows sold between January 12, 2017 and February 20, 2017, identified them as Tosta's cows. Hodges, however, acknowledged that the cows sold during the relevant period had a range of different types of ear tags, as reflected on the sales invoices. As to one cow, with an ear tag of K35, Hodges acknowledged that the cow was not Tosta's cow. As to two other cows, Hodges acknowledged they did not have ear tags at all.

Hodges said he kept cows at two facilities, one in Hilmar and one in Turlock. Tosta's cows were mixed in with other cows at both facilities. Some of the cows at both facilities did not have ear tags. *Hodges did not record ear tags for Tosta's cows in order to track them.* Hodges also could not recall when he last sent Tosta a check for any of the cows that were sold in the relevant period.

Following the trial, the superior court found that "the 49 cows sold at MLCC [between January 12, 2017 and February 20, 2017] were subject to Chaves'[s] Purchase

Money Security Agreement for Dairy Livestock with Hodges," and that "Chaves'[s] security interest is superior to the claimed security interest of MLCC." (Unnecessary capitalization omitted.) The court consequently determined that "judgment is to be entered in favor of Chaves and against MLCC in the sum of $18,95[7].40." (Unnecessary capitalization omitted.) The court set forth its decision, and explained it, in a final statement of decision (prior to the final statement of decision, the trial court had issued a tentative decision and a proposed statement of decision).

## DISCUSSION

### I.     Chaves had a Security Interest in the 49 Cattle Sold by MLCC for Hodges

MLCC challenges the court's decision in this matter, to the extent the court found that "the 49 cows sold at MLCC were subject Chaves'[s] Purchase Money Security Agreement for Dairy Livestock with Hodges." MLCC contends: "Hodges did not have an ownership interest in the [49] cattle sold by MLCC between January [12], 2017 and February 20, 2017," as "those cattle were owned by Tosta and all of [the] evidence offered at trial supports that proposition." MLCC argues that Chaves, in turn, did not have a security interest, on account of his purchase money security agreement with Hodges, in the 49 cattle sold by Hodges through MLCC between January 12, 2017 and February 20, 2017, and, therefore, cannot claim the $18, 957.40, in proceeds from the sale of those cows.[7]  Based on the foregoing contentions, MLCC seeks reversal of the judgment entered in the trial court. We disagree with MLCC's contentions and affirm the trial court's rulings that Chaves had (1) a security interest in the 49 cows sold by MLCC for Hodges in early 2017, and (2) a superior claim on the $18,957.40 in proceeds from the sale thereof.[8]

---

[7]     MLCC's brief refers to $18,952.40; however, the record reflects the relevant amount was $18,957.40.

[8]     The trial court's statement of decision also refers to $18,952.40 in damages awarded to Chaves; however, the record reflects the relevant amount is $18,957.40.

11.

### A. Background

The purchase money security agreement that was executed by Chaves and Hodges in conjunction with the sale of Chaves's cows to Hodges, provided that Chaves would have an ongoing security interest in the 400 cattle sold, *and* in additional collateral, including all dairy cattle owned at the time, or thereafter acquired, by Hodges, as well as in the products and proceeds thereof. (See Chaves's Ex. 2.) Specifically, the purchase money security agreement provided that the "Debtor shall provide Creditor with a purchase money security interest in dairy livestock hereinafter referred to as the 'Collateral,' " and more particularly described as follows:

> " '*All dairy livestock* including cows, dry cows, springers, heifers, calves, and bulls, *including, but not limited to Four hundred (400) purchase money Holstein lactating and dry cows, and all products and proceeds thereof, including natural increases (progeny), and subsequent purchases by bill of sale, draft or otherwise, which includes all dairy livestock now owned or hereafter acquired without limitation, and all products and proceeds thereof*, including government and cooperative entitlements, whether now owned or hereafter acquired, and all milk, milk products, milk proceeds, *accounts, accounts receivable, herd retirement or retention proceeds*, production base and contract rights, patronage dividends, owners equity, quality control payments, and retainages, including retain accounts and cash proceeds thereof, whether now owned or hereafter acquired' " (Italics added.)

The parties stipulated that Chaves perfected his security interest in the agreed-upon collateral for the sale of his herd to Hodges, by filing a UCC financing statement on the date of sale, January 22, 2016. The parties further stipulated: (1) between January 12, 2017 and February 20, 2017, MLCC sold "49 cattle of Sean Hodges"; (2) "Sean Hodges owed the sum of $18,957.40 to Modesto Livestock for cattle as evidenced by Sean Hodges['s] account ledger [maintained by Modesto Livestock]"; (3) the proceeds from the sale of "49 cattle of Sean Hodges … paid for cattle previously taken [from MLCC] by Sean Hodges"; (4) Hodges's account with MLCC was therefore "reduced to $[0.00] as of February 20, 2017"; and (5) "Modesto Livestock did not file a UCC

12.

Financing Statement with the California Secretary of State's Office." (Unnecessary capitalization omitted.)

After the trial, the trial court ruled, as reflected in its final statement of decision, as follows:

> "Chaves takes the position that the collateral agreed to as security for the sale extended beyond the cows that were the subject of the sale by Chaves. MLCC contends that because the cows were not related to those which were the subject of the sale between Chaves and Hodges, they were not part of the collateral for Chaves'[s] security interest and therefore the value attributed to such cows is not owed to Chaves as a priority creditor under the security agreement.

> "These matters are governed by the Commercial Code. A description of personal or real property as collateral is sufficient if it reasonably identifies what is described. (Cal. Com. Code §9108(a).) The description reasonably identifies the collateral if it identifies it by either specific listing, category, type, quantity, formula or procedure, if the identity of the collateral is objectively determinable. (Com. Code §9108(b).) However, a description such as 'all the debtor's assets' or 'all the debtor's personal property' is insufficient to reasonably identify the collateral. (Com. Code §9108(c).) Moreover, the Commercial Code specifically recognizes that a security agreement may create or provide a security interest in after-acquired collateral. (Com. Code §9204(a).) Such an interest is not merely equitable, and no further action is required for the interest to attach to such collateral. (Com. Code §9204, Uniform Commercial Code Comment 2.) [¶] … [¶]

> "Based on [*Bank of Cal. v. McCoy* (1937) 23 Cal.App.2d 192 and *Merced Production Credit Assn. v. Bayer* (1963) 222 Cal.App.2d 793], the law recognizes later acquired livestock—not involved in the sales transaction between Chaves and Hodges—as part of the intended collateral described in the security agreement. The inquiry then turns on a question of contract interpretation, i.e., was the livestock described as collateral in the security agreement limited to those which were the subject of the transaction between Chaves and Hodges or does the language extend to cover later-acquired livestock from other sources?

> "The security agreement and UCC financing statement describe the collateral as: 'All dairy livestock including cows, dry cows, springers, heifers, calves, and bulls, including but not limited to Four Hundred (400)

13.

purchase money Holstein lactating and dry cows, and all products and proceeds thereof, including natural increases (progeny), and subsequent purchases by bill of sale, draft or otherwise, which includes all dairy livestock now owned or hereafter acquired without limitation, and all products and proceeds thereof….' [¶] [Citation.]

"The description is clear. Chaves has a continuing security interest arising out of his Purchase Money Security Agreement for Dairy Livestock (Exhibit '2') in all the dairy livestock, including cows, dry cows, springers, heifers, calves and bulls. This includes the four hundred purchase money Holstein lactating and dry cows, and all the products and proceeds stemming from Hodges['s] purchase of the 400 cows. This includes … all dairy livestock now owned or hereinafter acquired [and all products and proceeds thereof,] accounts, accounts receivable, cash proceeds, now or hereinafter acquired, including all rights to payments of Hodges.

"The Court finds that the debt owed by Hodges to Chaves was not satisfied, and Chaves'[s] security interest continued following turnover of the 426 cows [i.e., 337 plus 89] by Hodges to Chaves. Chaves'[s] lien thereafter continued in the security as described in the Purchase Money Security Agreement for Dairy Livestock (Exhibit '2').

"The court finds that the 49 cows sold at MLCC were subject to Chaves's Purchase Money Security Agreement for Dairy Livestock with Hodges. Chaves'[s] security interest is superior to the claimed security interest of MLCC. Com. Code §9201 provides that a security agreement is effective according to its terms between the parties, against the purchasers of the collateral, and against creditors. [(]See, e.g., *Guild Wineries & Distilleries v. Land Dynamics* (1980) 103 Cal.App.3d 966, 973 – perfected security interest binds all subsequent holders of the collateral.)

"Com. Code §9315 governs the secured party's rights to recover the collateral or its proceeds. This section indicates that a security interest continues in the collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the disposition was authorized by the secured party. Moreover, the security interest attaches to any identifiable proceeds of the collateral, even if commingled with other properties, if the identity of the collateral can be traced by a legally permissible method. (Com. Code §9315(a),(b).) A secured party seeking to collect its collateral in agricultural goods has a right to bring a conversion action against the party retaining the collateral. [(]*American National Bank v. Cloud* (1988) 201 Cal.App.3d 766.[)] The commingled nature of the collateral or proceeds is not an issue here, as the parties acknowledge that the proceeds

or value of the subject cows obtained from Hodges by MLCC was $18,952.40. [¶] … [¶]

"MLCC's claim to title in the 49 cows is nothing more than a claimed security interest under the Commercial Code because possession of the cows was turned over by MLCC to Hodges. (See Com. Code §2401.) Further, Article 9 of the Commercial Code dealing with secured transactions in personal property also recognizes the limited scope of Article 2 and other title retention claims. Article 9 priorities apply regardless of retention of title claims. A seller or other creditor in goods sold may retain a secured interest through title, but only until such time as the debtor is given possession of the collateral. (See Com. Code §2202.)

"MLCC did not comply with statutory requirements to perfect its claimed retention of title interest, and it no longer had a title interest once it turned over possession to the debtor. Further, MLCC's contention that Chaves cannot collect secured proceeds because Chaves must have received cattle it sold to Hodges does not defeat [Chaves's] security interest in the proceeds. (*Knox v. Phoenix Leasing, Inc*. (1994) 29 Cal.App.4th 1357, 1366-1367.)

"For these reasons[,] judgment is to be entered in favor of Chaves and against MLCC in the sum of $18,952.40." (Unnecessary capitalization omitted.)

The trial court also resolved issues relevant to the distribution of cattle and cattle sale proceeds held pursuant to CDFA's hold order. The court ruled: "The Court finds that approximately 337 cattle were liquidated and the funds deposited with the [CDFA], which are subject to disposition by this Court. The CDFA holds at least $116,260.81 in cattle proceeds. From these proceeds the CDFA is owed estray fees of at least $8,425.00, leaving a balance of at least $107,835.81." The court determined that Martella Livestock Market, Inc. had "a first priority lien claim in the cattle proceeds subject to this case held by the CDFA, after statutory estray fees," whereby "the amount of $36,000 … shall be paid [to Martella Livestock Market, Inc.] as a first-priority from the cattle proceed funds held by the CDFA."

The court further found that Chaves had "a second-priority lien claim in all the remaining cattle proceeds subject to this case in the estimated sum of at least $71,835.81

15.

… arising out of [his] Purchase Money Security Agreement for Dairy Livestock with Sean Hodges executed on January 22, 2016, which was perfected by the filing of a UCC Financing Statement with the California Secretary of State's Office on January 22, 2106." The court determined: "All of the remaining cattle proceeds shall be paid as a second priority lien to Chaves." The court also ordered that the first $20,000 of the proceeds to be paid to Chaves would be directed to Henry Tosta, pursuant to Chaves's request (in light of Chaves's settlement with Tosta), while the remaining amount of at least $51,835.81 would be paid to Chaves himself. Finally, as to the 89 cattle of which Chaves took possession "subject to this case and the statutory hold orders of the CDFA," the court ordered that "Chaves shall have all the right, title and ownership interest in the 89 cattle, including the remaining 80 cattle, and any proceeds [therefrom]," on account of his "Purchase Money Security Agreement for Dairy Livestock with Hodges executed on January 22, 2016, and perfected by the filing of a UCC Financing Statement with the California Secretary of State's Office on January 22, 2016."

### B.    Analysis

California Uniform Commercial Code section 9203, subdivision (b) provides, in relevant part, that "a security interest is enforceable against the debtor and third parties with respect to the collateral" when the following conditions are satisfied: "(1) Value has been given"; "(2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party"; "(3) … The debtor has authenticated a security agreement that provides a description of the collateral." Furthermore, section 9204, subdivision (a) provides that "a security agreement may create or provide for a security interest in after-acquired collateral," and section 9315, subdivision (a)(2) clarifies that "[a] security interest attaches to any identifiable proceeds of collateral." Finally, an unsecured creditor cannot offset its advances to a debtor by crediting its accounts with sale proceeds to the detriment of a prior secured creditor with a claim to those proceeds, and a secured creditor seeking to collect its collateral or the proceeds thereof has a right

16.

to bring a conversion action against a party retaining the collateral. (*Imperial NH3 v. Central Valley Feed Yards, Inc*. (1977) 70 Cal.App.3d 513, 520; *American National Bank v. Cloud* (1988) 201 Cal.App.3d 766.)

Here, the trial court's decision is correct under the applicable legal framework as set forth above, and the factual findings necessary to support the trial court's determination are supported by substantial evidence.

Hodges bought 400 dairy cattle from Chaves for $740,000, by means of a loan extended by Chaves. Hodges and Chaves executed a purchase money security agreement to secure the loan amount. As noted in the purchase money security agreement, Chaves gave "new value" in the form of the $740,000 loan to Hodges to enable the latter to "purchase, take possession [of], and profit from the purchased dairy livestock," and in exchange for which value, Hodges provided Chaves with a security interest in the collateral and its proceeds, as described in the purchase money security agreement. Subsequently, Hodges stopped making payments to Chaves on the $740,000 loan and started selling off his herd of dairy cattle in part because, as he testified, he had "feed bills to pay." MLCC, which had an open account for Hodges for the purpose of buying and selling cattle, sold 49 cows for Hodges between January 12, 2017 and February 20, 2017, at a time when there was an outstanding balance of $18,957.40 in Hodges's account. The parties stipulated that the 49 cattle that were sold were Hodges's cattle (the court noted this stipulated fact in the summation of the evidence presented included in its final statement of decision). MLCC retained $18,957.40 from the proceeds obtained from the sale of the cattle; Hodges's account with MLCC was therefore zeroed out on February 20, 2017. Unlike Chaves, MLCC was not a secured creditor of Hodges; indeed, Chaves was a prior secured creditor in relation to MLCC.

In light of the applicable law and the foregoing facts, the trial court properly determined that "the 49 cows sold at MLCC were subject to Chaves's Purchase Money Security Agreement for Dairy Livestock with Hodges," and that "Chaves's security

interest is superior to the claimed security interest of MLCC."  Accordingly, the trial court correctly entered judgment in favor of Chaves in his conversion action against MLCC and awarded damages of $18,957.40 to Chaves and against MLCC.

MLCC attacks the trial court's ruling by pointing to certain findings in the court's initial, tentative decision that MLCC alleges are incompatible with the court's ultimate ruling, as reflected in its final statement of decision.  Specifically, MLCC argues that the court's ultimate ruling does not make sense in light of the court's tentative decision, which noted, "Hodges's uncontradicted testimony was that all of the cattle Hodges sold between January 12, 2017 and February 20, 2017 were cattle that Hodges obtained from Tosta, and were not cattle in which Chaves had a security interest."  Relying on the above statement in the court's tentative decision, MLCC contends:  "The Court found that the cattle in question were cattle that Hodges leased from Tosta and thus, Tosta's cattle could not be considered 'after acquired livestock' of Hodges."  However, the record is clear that the court completely jettisoned its tentative decision and ultimately reached a conclusion opposite to that reflected in its tentative decision.  (See Cal. Rules of Court, rule 3.1590(b) [tentative decision is not binding on the court].)  MLCC's reliance on the court's tentative decision is therefore unavailing.

In its final ruling, the court impliedly rejected Hodges's self-serving testimony that all of the 49 cattle he sold through MLCC in early 2017 were cattle that he had leased from Tosta.  Not only was Hodges's testimony at odds with the parties' stipulation that the 49 cattle Hodges sold through MLCC in early 2017 were Hodges's cattle, but Lary Gremp of MLCC also testified that the cattle sold by Hodges were Hodges's cattle.  None of the sales invoices for the transactions at issue referred to Tosta.  Hodges also acknowledged that the sales documentation for the cows sold in the relevant time period showed the cows were unbranded; they did not have Tosta's brand on them.  Hodges further acknowledged that he was aware, when these sales occurred, that Chaves had a blanket security interest in cows owned by Hodges, yet Hodges took no affirmative steps

to prove that the cows he was selling belonged to Tosta. Instead, Hodges merely claimed at trial that not every cow that belonged to Tosta was identified by Tosta's brand.

Hodges suggested the cows had ear tags, and he believed the ear tags on the cows sold between January 12, 2017 and February 20, 2017, identified them as Tosta's cows. However, the cows sold during the period had a range of different types of ear tags, as reflected on the sales invoices. As to one cow, with an ear tag of K35, Hodges acknowledged that the cow was not Tosta's cow. As to two other cows, Hodges acknowledged they did not have ear tags at all. Moreover, Hodges acknowledged he did not record ear tags for Tosta's cows in order to track them. Hodges also could not recall when he last sent Tosta a check for any of the cows that were sold. Rather, Hodges testified he sold the cows because he had feed bills to pay, and the evidence supported an inference that Hodges sold the cows to pay off the outstanding balance on his account with MLCC because MLCC had cut him off from making any further purchases in light of his unpaid balance. Given this record, the court's implied rejection of Hodges's testimony that all the 49 cows he sold through MLCC in early 2017 were Tosta's cows, was entirely reasonable.

As noted above, the trial court's determinations were supported by substantial evidence, including in light of the parties' stipulation that the 49 cattle at issue were the cattle of Sean Hodges. Furthermore, to the extent the trial court made an implied finding that Hodges had commingled cows from various sources at both his Hilmar and Turlock facilities, whereby the 49 cows he sold through MLCC in early 2017 represented commingled goods, such a finding was also supported by substantial evidence. (See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115-1116, fn. 6 [we presume the "trial court impliedly found every fact necessary to support its order"]; *Finney v. Gomez* (2003) 111 Cal.App.4th 527, 545 ["If the trial court has made no findings, the reviewing court will infer all findings necessary to support the judgment and then examine the record to see if the findings are based on substantial evidence."].)

19.

Chavez and Silva testified that the cows at Hodges's facilities were of various brands and mostly unbranded. Hodges testified that he had obtained cows from various sources and they were commingled in his two facilities. Hodges also testified that he did not record any ear tags present on the cows. Finally, CDFA's hold order reflected that Hodges had cows with various brands as well as unbranded cows.

Moreover, to the extent the court made an implied finding that the 49 cows were commingled in the sense of not necessarily being identifiable as originating from specific sources, Chaves would have a security interest therein pursuant to section 9336 of the California Uniform Commercial Code. California Uniform Commercial Code section 9336, subdivision (a) defines " 'commingled goods' " as "goods that are physically united with other goods in such a manner that their identity is lost in a product or mass." Section 9336, subdivision (c) provides that "[i]f collateral becomes commingled goods, a security interest attaches to the product or mass," and section 9336, subdivision (d) clarifies that "[i]f a security interest in collateral is perfected before the collateral becomes commingled goods, the security interest that attaches to the product or mass under subdivision (c) is perfected." Official Comment 2 to California Uniform Commercial Code section 9336 explains: "Subsection (a) defines 'commingled goods.' It is meant to include goods whose identity is lost through manufacturing or production (e.g., flour that has become part of baked goods) but also goods whose identity is lost by commingling with other goods from which they cannot be distinguished (e.g., ball bearings)."

In sum, we detect no error in the trial court's ruling that Chaves had a security interest in the 49 cows sold by Hodges through MLCC in early 2017 and that Chaves's prior security interest was superior to any claimed security interest on the part of MLCC.

## II. Court Properly Entered Judgment Against MLCC in the Sum of $18,957.40

MLCC contends that the damages in the sum of $18,957.40 awarded to Chaves are not supported by substantial evidence because the debt owed to Chaves was satisfied

20.

when the third-party debtor, Hodges, turned over 426 cattle [i.e., 337 plus 89] to Chaves and CDFA.  We disagree.

The trial court found that "the debt owed by Hodges to Chaves was not satisfied, and Chaves'[s] security interest continued following turnover of the 426 cows by Hodges to Chaves.  Chaves'[s] lien thereafter continued in the security as described in the Purchase Money Security Agreement for Dairy Livestock (Exhibit '2')."  (Unnecessary capitalization omitted.)  Furthermore, upon finding that Chaves's lien extended to the 49 cows sold by Hodges through MLCC in early 2017, the court ordered that "judgment is to be entered in favor of Chaves and against MLCC in the sum of $18, 95[7].40."  (Unnecessary capitalization omitted.)  We detect no error in the court's determinations and affirm the judgment.

The evidence presented at trial showed that CDFA liquidated 337 cows taken from Hodges by Chaves; CDFA held on to proceeds of this sale for distribution upon determination of the rights of various creditors of Hodges.  The evidence further showed that Chaves was holding an additional 89 cows on behalf CDFA pending resolution of the instant matter.  The trial court's post-trial order credited $71,835.81 from the proceeds held by CDFA to Chaves; the court's order further credited the 89 cows conditionally possessed by Chaves to Chaves.  Taking into consideration these and all prior payments to Chaves, Hodges still owed $365,970.67 to Chaves (the calculations underlying this figure are reflected in Chaves's brief and are not disputed by MLCC).

In the instant matter, Chaves sought $18,957.40 from MLCC.  The parties stipulated that "[b]etween January 12, 2017 and February 20, 201[7], Modesto Livestock sold or other[wise] collected proceeds from 49 cattle of Sean Hodges[,] which paid for cattle previously taken by Sean Hodges."  (Unnecessary capitalization omitted.)  The record further showed that MLCC retained $18,957.40 from the proceeds generated by the sale of the 49 cattle at issue to defray the outstanding balance in Hodges's account with MLCC.  However, as the trial court properly determined, Chaves had a superior

21.

security interest relative to MLCC's claimed security interest in the 49 cattle sold by MLCC on behalf of Hodges (see above). On this record, the award of $18,957.40 in damages to Chaves and against MLCC was supported by substantial evidence and was entirely proper.

## DISPOSITION

The judgment is affirmed. Chaves to recover his costs on appeal.

SMITH, J.

WE CONCUR:


DETJEN, Acting P.J.


MEEHAN, J.

22.